

FILED

AUG 16 2002

Phil Lombardi, Clerk
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KRISTINE ZEIGLER and KAREN RAIDER, on behalf of themselves and a class of persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WILLIAMS COMPANIES INC., HUGH M. CHAPMAN, GLENN A. COX, THOMAS H. CRUIKSHANK, WILLIAM E. GREEN, W.R. HOWELL, JAMES C. LEWIS, CHARLES M. LILLIS, GEORGE A. LORCH, FRANK T. MACINNIS, STEVEN J. MALCOLM, PETER C. MEINIG, GORDON R. PARKER, JANICE D. STONEY, JOSEPH H. WILLIAMS, KEITH E. BAILEY, JAMES R. HERBSTER, MICHAEL JOHNSON, JACK D. MCCARTHY, NICK BACILE, G.L. BEST, JOHN BUMGARNER, TRAVIS CAMPBELL, R. RAND CLARK, DEBBIE FLEMING, JIM IVEY, HOWARD KALIKA, LARRY LITTLEFIELD, MARCIA MACLEOD, DAN MILLER, RON MUCCI, LEW POSEKANY, SCOTT WELCH, MARK WILSON, PHIL WRIGHT, and DAVID YOUNG,<br><br>Defendants. | HONORABLE SVEN ERIK HOLMES<br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT<br><br>Case No. 02-CV-285<br><br>CLASS ACTION COMPLAINT |

For their Complaint against Defendants, Plaintiffs allege as follows:

## NATURE OF THE ACTION

1.      This is a civil enforcement action brought pursuant to Section 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act ("ERISA") (29 U.S.C. § 1132(a)(2) and (a)(3)).

2.      The lawsuit concerns the Williams Companies Inc. Investment Plus Plan (the "Plan"), a 401(k) Plan established and maintained by Williams Companies (the "Company") as a benefit for employees to permit tax-advantaged savings for retirement and other long-term goals.

3.      Plaintiffs sue Hugh M. Chapman, Glenn A. Cox, Thomas H. Cruikshank, William E. Green, W.R. Howell, James C. Lewis, Charles M. Lillis, George A. Lorch, Frank T. MacInnis,

AMENDED COMPLAINT - 1

Steven J. Malcolm, Peter C. Meinig, Gordon R. Parker, Janice D. Stoney, Joseph H. Williams, Keith E. Bailey, James R. Herbster, Michael Johnson, Jack D. McCarthy, Nick Bacile, G.L. Best, John Bumgarner, Travis Campbell, R. Rand Clark, Debbie Fleming, Jim Ivey, Howard Kalika, Larry Littlefield, Marcia MacLeod, Dan Miller, Ron Mucci, Lew Posekany, Scott Welch, Mark Wilson, Phil Wright and David Young, who, as set forth in more detail below, have been fiduciaries with respect to the Plan within the meaning of § 3(21) of ERISA during the relevant time period and the directors and/or officers of the Company; and the Company.

4.    The Plaintiffs, Kristine Zeigler and Karen Raider, are former employees of the Company who are former and current participants of the Plan within the meaning of § 3(7) of ERISA, 29 U.S.C. § 1002(7). They claim that the Defendants are fiduciaries of the Plan, and that the Defendants breached their fiduciary duties to Plaintiffs and the other participants and beneficiaries of the Plan in violation of ERISA § 1104 (29 U.S.C. § 1104) in a variety of ways, especially in connection with the Plan's acquisition and holding of company stock. Pursuant to ERISA § 409, 29 U.S.C. § 1109 they claim that Defendants are obliged to make good to the Plan the losses resulting from the breaches of fiduciary duty. These losses have yet to be calculated, but they will run to the tens of millions of dollars. They further claim that Defendants are subject under ERISA § 409 to other appropriate equitable relief to redress the violations described herein.

5.    Because their claims are for Plan-wide relief and apply to the participants and beneficiaries as a whole, and because ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes plan participants such as Kristine Zeigler and Karen Raider to sue for losses suffered by the Plan as a result of breaches of fiduciary duty, and for other appropriate relief, they seek to bring this action on behalf of herself and the class of all the participants and beneficiaries of the Plans during the relevant period. Insofar as Defendants are sued alternatively as knowing participants in a breach of trust for equitable relief, Plaintiffs proceed pursuant to § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and the specific jurisdictional statute for claims of this type, ERISA § 502(e)(1) (29 U.S.C. § 1132(e)(1)), and personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k).

7.      Venue is properly laid in this district pursuant to ERISA § 502(e)(2) (29 U.S.C. § 1132(e)(2)) because the Plan was administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and one or more of the Defendants may be found in this District.

## THE PLAN

8.      The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A) (29 U.S.C. § 1002(2)(A)). Further, it is an "eligible individual account plan" within the meaning of ERISA § 407(d)(3) (29 U.S.C. § 1107(d)(3)) and also a "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401(k) (26 U.S.C. § 401(k)). The EIN is 73-0569878 and the plan number is 008. The Plan is not a party to this action. Pursuant to ERISA, however, the relief requested in this action is for the benefit of the Plan.

9.      At all relevant times, the Company was a sponsor of the Plan.

10.     The Plan has two separate components: (1) a contributory portion, which consists of voluntary participant contributions and employer matching contributions; and (2) a bonus portion, which consists entirely of employer contributions.

(a)     **Voluntary Participant Contributions**

11.     Participants in the Plan may contribute from 1% to 16 % of their compensation (1% to 10% for Highly Compensated Employees) subject to certain limits described by the Code.

AMENDED COMPLAINT - 3

**(b)     Employer Matching Contributions**

12.     The Company matches pre-tax and after-tax contributions to the Plan dollar-for-dollar up to 6 percent of the participants' eligible compensation. All of the Company's matching contributions are invested solely in Williams Companies, Inc. common stock, and participants have not been permitted to re-direct the proceeds of these matching contributions among the other investment options until the participant reaches age 50, or upon termination of employment. A participant is not eligible to receive employer matching contributions for any period of time during which the participant does not make contributions to the Plan.

**(c)     Company Bonus Contributions to Plan (BESOP)**

13.     BESOP Fund shares of Williams common stock are allocated on an annual basis to the accounts of participating employees on a pro rata basis according to eligible compensation.

**(d)     Investment Options**

14.     The participants and beneficiaries of the Plan are presented with alternative investment options represented to them as suitable for participant contributions and Company retirement contributions. One of the alternative investment options presented to the participants and beneficiaries of the Plan is Williams common stock. In addition, at the time of its spin off in an IPO, the participants were offered an opportunity to invest in Williams Communications Group ("WCG") stock.

**(e)     Vesting**

15.     Participant voluntary contributions and post-1997 BESOP Employer Contributions are 100% vested. A participant becomes 100% vested in Employer Matching Contributions and pre-1998 BESOP Employer Account if the participant retires, terminates employment due to disability, dies, there is a permanent layoff or reduction in force, or there is a complete discontinuance of employer contributions to, or termination or partial termination of, the Plan. Otherwise, an employees' rights in the company contributions, including pre-1998 BESOP Employer

AMENDED COMPLAINT - 4

Contributions, vest 20% upon completion of the first year of employment, and an additional 20% for each completed year of employment thereafter until fully vested.

**(f)     Assets**

16.     As of December 31, 2001, about $929 million of $1.355 billion, or approximately 69% of the assets of the Plan, were in both Williams Company and Williams Communication Group stock.

**(g)     Plan Administration**

17.     The operation of the Plan is directed by the Benefits Committee, whose members are appointed by the Board of Directors of the Company. The Benefits Committee has the authority and responsibility for the following:

> (1)     All amendments to the Plan, except to the extent such authority is reserved to the Board of Directors;
>
> (2)     The approval of any merger or spinoff of any part of the Plan;
>
> (3)     The appointment, removal, or replacement of the Trustee, Investment Managers, any member of the Administrative Committee, or any member of the Investment Committee; and
>
> (4)     The delegation of responsibilities to the Trustee, the Administrative Committee, Investment Committee, or any other person or entity.

18.     Additionally, the Benefits Committee may direct the Trustee to delete an Investment Fund from the Plan or establish a new Investment Fund in the Plan.

19.     The Benefits Committee has delegated authority to administer the Plan on a day-to-day basis to an Administrative Committee. The Administrative Committee administers the Plan in accordance with its terms and has all the powers necessary to carry out such terms. The Administrative Committee is the Plan Administrator.

AMENDED COMPLAINT - 5

## PARTIES

Plaintiffs

20.    Plaintiff Kristine Zeigler is a resident of Chicago, Illinois.  She is a former employee of Williams Companies.  Plaintiff Zeigler held approximately 450 shares of WMB stock in the Plan. She also acquired 371 shares of WCG stock in the Plan in connection with the Williams Communication Group initial public offering.

21.    Plaintiff Karen Raider is a resident of Owensboro, Kentucky.  She is a former employee of Williams Companies.  Plaintiff Raider currently holds approximately 710 shares of WMB stock in the Plan.

22.    Plaintiffs Zeigler and Raider are current and former "participants" (respectively) in the Plan within the meaning of ERISA § 3(7) (29 U.S.C. § 1002(7)). Plaintiff Raider has been a participant in the Plan since February, 1987, while Plaintiff Zeigler was a participant in the Plan from March, 1996 through November, 2001.

Defendants

23.    Defendant Williams Companies, Inc. is a Delaware corporation with its principal executive offices located at One Williams Center, Tulsa, Oklahoma 74172.  Williams Companies, Inc. engages in energy-related activities, including energy commodity marketing and trading and other energy-related services, including the transportation and storage of natural gas and other energy-related industries.  Williams Companies, Inc. owned 86% of Williams Communications Group, Inc. until it effected a tax-free spin-off of Williams Communications Group, Inc. to its shareholders effective April 23, 2001.

24.    (a)    Defendant Hugh M. Chapman ("Chapman") was at times relevant hereto a director of the Company.  Chapman participated in communications to Plan participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Williams Companies stock to be issued to Plan participants.

AMENDED COMPLAINT - 6

(b)     Defendant Glenn A. Cox ("Cox") was at times relevant hereto a director of the Company.  Cox participated in communications to Plan participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Williams Companies stock to be issued to Plan participants.

(c)     Defendant Thomas H. Cruikshank ("Cruikshank") was at times relevant hereto a director of the Company.  Cruikshank participated in communications to Plan participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Williams Companies stock to be issued to Plan participants.

(d)     Defendant William E. Green ("Green") was at times relevant hereto a director of the Company.  Green participated in communications to Plan participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Williams Companies stock to be issued to Plan participants.

(e)     Defendant W.R. Howell ("Howell") was at times relevant hereto a director of the Company.  Howell participated in communications to Plan participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Williams Companies stock to be issued to Plan participants.

(f)     Defendant James C. Lewis ("Lewis") was at times relevant hereto a director of the Company.  Lewis participated in communications to Plan participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Williams Companies stock to be issued to Plan participants.

(g)     Defendant Charles M. Lillis ("Lillis") was at times relevant hereto a director of the Company.  Lillis participated in communications to Plan participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Williams Companies stock to be issued to Plan participants.

AMENDED COMPLAINT - 7

(h)     Defendant George A. Lorch ("Lorch") was at times relevant hereto a director of the Company. Lorch participated in communications to Plan participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Williams Companies stock to be issued to Plan participants.

(i)     Defendant Frank T. MacInnis ("MacInnis") was at times relevant hereto a director of the Company. MacInnis participated in communications to Plan participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Williams Companies stock to be issued to Plan participants.

(j)     Defendant Steven J. Malcolm ("Malcolm") was at times relevant hereto a director of the Company. Malcolm participated in communications to Plan participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Williams Companies stock to be issued to Plan participants.

(k)     Defendant Peter C. Meinig ("Meinig") was at times relevant hereto a director of the Company.

(l)     Defendant Gordon R. Parker ("Parker") was at times relevant hereto a director of the Company. Parker participated in communications to Plan participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Williams Companies stock to be issued to Plan participants.

(m)     Defendant Janice D. Stoney ("Stoney") was at times relevant hereto a director of the Company. Stoney participated in communications to Plan participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Williams Companies stock to be issued to Plan participants.

(n)     Defendant Joseph H. Williams ("Williams") was at times relevant hereto a

AMENDED COMPLAINT - 8

director of the Company. Williams participated in communications to Plan participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Williams Companies stock to be issued to Plan participants.

(o)    Defendant Keith E. Bailey ("Bailey") was at times relevant hereto Chairman, President and Chief Executive Officer of the Company. Bailey also served on the Benefits Committee from 1998 through the present. Bailey participated in communications to Plan Participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Williams Companies stock to be issued to Plan participants.

(p)    Defendant James R. Herbster ("Herbster") was at times relevant hereto Senior Vice President of Administration of the Company. Herbster also served on the Benefits Committee from 1998 through January 1, 2000.

(q)    Defendant Michael Johnson ("Johnson") was at times relevant hereto Senior Vice President of Human Resources and Administration of the Company. Johnson also served on the Benefits Committee from January 1, 2000 through the present, and served on the Investment Committee from March 26, 1999 through September 13, 2000.

(r)    Jack D. McCarthy ("McCarthy") was at times relevant hereto Senior Vice President of Finance and Chief Financial Officer of the Company. McCarthy also served on the Benefits Committee from 1998 through the present. McCarthy participated in communications to Plan participants, including, for example, by execution of the Company's Registration Statement on Form S-8 relating to shares of Williams Companies stock to be issued to Plan participants.

(s)    Nick Bacile ("Bacile") served on the Investment Committee from February 24, 1999 through March 26, 1999, and from March 1, 2000 through November 27, 2001.

(t)    G.L. Best ("Best") served on the Investment Committee from February 24, 1999 through March 26, 1999.

AMENDED COMPLAINT - 9

(u)    John Bumgarner ("Bumgarner") served on the Investment Committee on March 26, 1999, March 1, 2000 and November 15, 2000.

(v)    Travis Campbell ("Campbell") served on the Investment Committee from February 24, 1999 through November 17, 1999, on May 24, 2000, and from November 15, 2000 through November 27, 2001.

(w)    R. Rand Clark ("Clark") served on the Investment Committee from February 24, 1999 through November 27, 2001.

(x)    Debbie Fleming ("Fleming") served on the Investment Committee from March 26, 1999 through September 15, 1999.

(y)    Jim Ivey ("Ivey") served on the Investment Committee from February 24, 1999 through March 26, 1999, from November 17, 1999 through September 13, 2000, and from February 27, 2001 through November 27, 2001.

(z)    Howard Kalika ("Kalika") served on the Investment Committee from March 26, 1999 through September 15, 2000, on March 24, 2000, and from November 15, 2000 through February 27, 2001.

(aa)    Larry Littlefield ("Littlefield") served on the Investment Committee from March 26, 1999 through September 15, 1999.

(bb)    Marcia MacLeod ("MacLeod") served on the Investment Committee from November 15, 2000 through September 26, 2001.

(cc)    Dan Miller ("Miller") served on the Investment Committee on March 1, 2000.

(dd)    Ron Mucci ("Mucci") served on the Investment Committee from November 17, 1999 through November 27, 2001.

(ee)    Lew Posekany ("Posekany") served on the Investment Committee from February 24, 1999 through May 24, 2000.

AMENDED COMPLAINT - 10

(ff)    Scott Welch ("Welch") served on the Investment Committee from March 1, 2000 through November 27, 2001.

(gg)    Mark Wilson ("Wilson") served on the Investment Committee from September 26, 2001 through November 27, 2001.

(hh)    Phil Wright ("Wright") served on the Investment Committee from February 24, 1999 through November 17, 1999, and from May 24, 2000 through May 22, 2001.

(ii)    David Young ("Young") served on the Investment Committee from February 24, 1999 through March 26, 1999.

25.    On information and belief, because of the Individual Defendants' positions with the Company, they had access to adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plan, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to them in connection therewith.

**CLASS ACTION ALLEGATIONS**

26.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class (the "Class") of all persons similarly situated.  The Class itself consists of all persons who were participants in or beneficiaries of the Plan at any time from March 1, 1999 through the present (the "Class Period").

27.    Plaintiffs meet the prerequisites to bring this action on behalf of the Class because:

- **Numerosity**.  The Class consists of thousands of individuals and is so numerous that joinder of all members as individual Plaintiffs is impracticable.

- **Commonality**.  There are questions of law and fact common to the Class.

AMENDED COMPLAINT - 11

- **Typicality**.  Plaintiffs' claims are typical of the claims of the Class.

- **Adequacy**.  Plaintiffs will fairly and adequately protect the interests of the Class.  They have no interests that are antagonistic to or in conflict with the interest of the Class as a whole, and they have have engaged competent counsel, highly experienced in ERISA class actions concerning employer securities in 401(k) plans, as well as in other class and complex litigation, to ensure protection of the interests of the Class as a whole.

28.    As an ERISA breach of fiduciary duty action for plan-wide relief, this is a classic Rule 23(b)(1)(B) class action.  The prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.  However, this action is also maintainable as a class action under the other subsections (b) of Rule 23:

- **Rule 23(b)(1)(A)**.  The prosecution of separate actions by the members of the Class would create a risk of inconsistent or varying adjudications with respect to the individual members of the Class, which would establish incompatible standards of conduct for Defendants.

- **Rule 23(b)(2)**.  The Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

- **Rule 23(b)(3)**.  Questions of law and fact common to members of the Class predominate over any questions affecting only individual members, and the class action is superior to other available methods for the fair and efficient

AMENDED COMPLAINT - 12

adjudication of the controversy.   This case presents numerous common questions of law and fact including:

(1)     Did Defendants' communications to participants provide "complete and accurate" information concerning the risks of investing in WMB and WCG stock?

(2)     Did Defendants provide false and misleading information, or fail to disclose material information, concerning the financial health of the Company?

(3)     What steps, if any, did Defendants take to investigate and monitor whether it was appropriate to continue to offer Company stock as a retirement vehicle for participants?

(4)     What action, if any, did Defendants take to resolve conflict of interest and/or to communicate those conflicts to participants?

(5)     Did Defendants take adequate steps to protect the Plans and recover Plan damages?

## DEFENDANTS' FIDUCIARY STATUS

29.     During the Class Period, the Defendants had discretionary authority or discretionary control respecting management of the Plan, and/or authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or responsibility for the administration of the Plan.

30.     During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to ERISA § 3(21)(A) (29 U.S.C. § 1002(21)(A)) and the law interpreting that section.

31.     ERISA requires every plan to provide for one or more named fiduciaries, who will have "authority to control and manage the operation and administration of the plan."   ERISA § 402(a)(1) (29 U.S.C. § 1102(a)(1)).   In addition, § 403 (a)(1), 29 U.S.C. § 1103(a)(1), allows

authority and discretion to manage and control plan assets to be allocated to named fiduciaries. Instead of delegating or allocating fiduciary responsibility for the Plan and its assets to external service providers, the Company chose to comply with the requirement of section 402(a)(1) by internalizing the fiduciary function. It did so in various ways.

32.    First, during the Class Period, the Company, through its Board, designated a Benefits Committee empowered by the governing plan documents to control and manage the operation of the Plan, with the power, inter alia, to add or delete investment funds from the Plan, to appoint, remove and direct the Trustee, to appoint and remove members of the Investment Committee, Investment Managers, and members of the Administrative Committee (which administers the plan in accordance with its terms); to establish investment objectives and guidelines to govern the Investment Managers; to delegate responsibility to other persons or entities, and to retain professional service providers.    The Investment Committee monitors the performance of investment funds and investment managers, and makes recommendations to the Benefits Committee on investment funds and investment managers. The Investment Committee also implements any investment objectives or guidelines which may be established by the Benefits Committee.  To the extent that the Company acting through its Board of Directors, the Board of Directors itself, the Benefits Committee, and the Investment Committee are each expressly allocated certain fiduciary authority under the terms of the Plan, and the Plan provides for a procedure for the selection of the Benefits Committee and the Investment Committee, the Defendant Company, Defendant members of the Board of Directors of the Company and Defendant members of these committees are Named Fiduciaries of the Plan within the meaning of ERISA § 402(a)(2), 29 U.S.C. § 402(a)(2), subject to the fiduciary responsibility provisions of ERISA.  The governing Plan Document has allocated authority to the Investment Committee to make recommendations to it (the Benefits Committee) the investment funds and investment managers under the Plan. The Investment Committee monitors the performance of such

AMENDED COMPLAINT - 14

investment funds and investment managers.  The Investment Committee also implements any
investment objectives or guidelines, which may be established by the Benefits Committee.

33.    Second, ERISA treats as fiduciaries not only persons explicitly named as fiduciaries
under Section 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, perform
fiduciary functions.  ERISA § 3(21)(A)(i) (29 U.S.C. § 1002(21)(A)(i)) makes a person a fiduciary
"to the extent . . . he exercises any discretionary authority or discretionary control respecting
management of such plan or exercises any authority or control respecting management of disposition
of its assets. . ."  During the Class period, by exercising the authority or control allocated to each of
them, including their authority to appoint and remove other fiduciaries, Defendant Company,
Defendant members of the Board of Directors of the Company, Defendant members of the Benefits
Committee, and Defendant members of the Investment Committee performed fiduciary functions
under this standard, and thereby also acted as fiduciaries under ERISA.

34.    In addition, under ERISA, in various circumstances, non-fiduciaries who knowingly
participate in fiduciary breaches may themselves be liable.  To the extent any of the Defendants are
held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the
fiduciary breaches described below, for equitable relief including restitution pursuant to § 502(a)(3),
29 U.S.C. § 1132(a)(3) of ERISA.

35.    During the class period, and before, Defendants' direct and indirect communications
with Plan participants included material misrepresentations and omissions which caused Plan
participants and beneficiaries to continue to purchase and to hold and maintain investments in
Williams Companies stock in the Plan.  These communications included, but were not limited to,
SEC filings, prospectuses, summary plan descriptions, and the Company's Form S-8 Registration
Statements pertaining to Company stock to be issued to Plan participants.  These communications
were made by Defendants to Plan participants in the Defendants' capacities as ERISA fiduciaries.

AMENDED COMPLAINT - 15

## SUBSTANTIVE ALLEGATIONS

### A.     Background Information

36.     Williams Companies, Inc. is a Delaware corporation, with its principal executive offices located in Tulsa, Oklahoma.  Williams Companies engages in energy-related activities, including transportation and storage of natural gas and relative activities; exploration and production of oil and gas; natural gas gathering, processing, and treating activities; natural gas liquids transportation; transportation of petroleum products and related terminal services; and other energy-related services, including energy commodity marketing and trading.  For the nine months ended September 30, 2001, Williams Companies reported revenues of $8.72 billion, with purported earnings from continuing operations of $939.1 million.  Prior to the April 2001 spin-off of Williams Communications Group, Inc., Williams Companies was the parent of Williams Communications Group and held 86% of Williams Communications Group's common shares.

37.     Beginning in July, 2000, market analysts and commentators consistently warned, over the objection of Defendants, that there existed in the broadband market an over-supply of fiber-optic capacity.  As shares of pure fiber-optic network carrier companies fell as much as 50% from their highs during FY:00 and as fears of overcapacity cut into expectations of future revenues, many companies continued their race to lay thousands of miles of fiber-optic cables to build networks and expand the amount of data these networks can carry at an annual rate of increase above 80%.  In fact, at or around the July, 2000, Renaissance Strategy Networks, a market research firm which analyzed the broadband market, concluded that in addition to the huge over-supply of "dark" or "un-lit" fiber capacity that existed, the expected capacity of "lit," or activated, fiber would also expand by 79% per year, and by 2004 will amount to 160% of peak demand, with the result being deteriorating commodity pricing for broadband. Renaissance further expressed the view that, even assuming demand increased according to expectations, all potential demand could probably not

make use of the fiber network, since access to routes from homes and local networks would be slowed due to less efficient access to the main networks.

38.　　Evidence of the glut of capacity which existed throughout the Class Period is further demonstrated by the fact that by July, 2000, almost 100 million miles of optical fiber – more than enough to reach the sun – were laid around the world almost all of which was done in the prior two years, as companies spent tens and hundreds of billions of dollars to build broadband communications networks. This massive spending and build-out of capacity way in excess of demand also led to massive price cuts for broadband, and record defaults on telecom bonds which led to an unwillingness on the part of lenders to loan money to broadband suppliers. In fact, during the first half of 2001 alone, telecom companies defaulted on $13.9 billion of telecommunications bonds, resulting in investor losses of at least $12.8 billion, according to Fitch credit rating service. This compared to losses on similar bonds of approximately $5.2 billion for 2000. These debt defaults resulted, in part, from declines in bandwidth prices in 2000 of 60% and of another 60% during the first half of 2001. In fact, between mid-2000 and the end of 1Q:01, lenders had accumulated so much telecom debt, and so many U.S. telecom companies had either filed for bankruptcy or were on the verge thereof, that the telecom industry's $700 billion of debt was described by market commentators and analysts as a "ticking time bomb."

39.　　At the same time that prices were falling and over-supply problems were growing in the fiber-optic network arena, the opposite was the case in the energy and natural gas markets. In fact, in June 2000, natural gas prices reached record highs in trading on the New York Mercantile Exchange. Thus, in June 2000, as supplies failed to keep up with demand, natural gas commodities prices rose as high as $3.72 per thousand feet, up 47 percent from contract prices which existed a year ago. Not surprisingly, it was the combination of rising energy prices and stagnating and declining prices for broadband, in addition to higher than expected costs for building and operating the broadband network, that ultimately led Williams Companies to decide to spin-off Williams

AMENDED COMPLAINT - 17

Communications Group. Despite Williams Companies' suggestion at that time, that the spin-off was in the best interest of *both* companies; the spin-off of Williams Communications Group was not effectuated to allow Williams Communications Group "easier access to capital" or to provide more clarity into the operations of the respective companies. Rather, as alleged herein, the spin-off of Williams Communications Group was engineered for the sole purpose of removing Williams Communications Group's mounting losses and rising expenses from Williams Companies' balance sheet, before it was revealed that these costs and expenses were continuing to escalate beyond announced expectations, and before investors, including employee investors, came to realize the true impaired condition of Williams Communications Group.

40.    Thus, it was against these market conditions that Williams Companies rushed to spin off Williams Communications Group in April, 2001, prior to the time that investors learned of its true impaired condition and while commodity prices remained high. Williams Companies attempted to dump Williams Communications Group and thereby remove its losses from Williams Companies' balance sheet and also avoid a massive write-down as Williams Communications Group's stock price was decimated as its impaired condition slowly became known to investors. Williams Companies believed that by dumping Williams Communications Group, it could then acquire Barrett, and quickly hedge Barrett's reserves through the sale of commodities contracts at all time high prices through Williams Companies' commodities trading division. Williams Companies wrongly believed it could both distance itself from the problems at Williams Communications Group while at the same time reaping huge profits from its hedging transactions. Unfortunately, in order to spin-off Williams Communications Group, Williams Companies was forced to guarantee approximately $2.5 billion of Williams Communications Group debt in order to prop-up Williams Communications Group and give that company the appearance that it had sufficient financing to fund Williams Communications Group until such time that it could generate sufficient cash from operations to fund its massive debt and skyrocketing expenses. *In guaranteeing Williams*

*Communications Group's debt while hiding the impairment of that company, however, Williams*
*Companies exposed shareholders, including employee shareholders, of the Company to a huge*
*undisclosed financial liability.*

41.    Then, on January 29, 2002, Williams Companies shocked the market by announcing
that it would be delaying the release of its 2001 earnings "pending an internal assessment of
Williams' contingent obligations to Williams Communications." According to the press release,
Williams Companies "expects to be able to estimate the financial effect, if any, regarding its ultimate
obligation related to Williams Communications Group's $1.4 billion debt and network lease
agreement covering assets that cost $750 million."

42.    Williams Companies further shocked the market in July, 2002, when it reported a
hefty second quarter loss, instead of an expected profit, and cut its stock dividend by 95 percent.

43.    In response to Williams Companies' shocking announcements and other revelations
described below, the price of Williams Companies common stock has declined sharply, falling from
nearly $50 per share in June, 1999, to as low as 83 cents per share in July, 2002, while Williams
Communications Group common stock is currently trading at less than one cent per share.

**B.    Williams Companies' False and Misleading Financial Results Are Reported to
Unsuspecting Employees and the Market**

44.    Beginning on March 1, 1999, Defendants caused, allowed and failed to correct
systematic misrepresentation of Williams Companies financial results through accounting
improprieties, and did not disclose that the spin-off of Williams Communications Group was
engineered for the sole purpose of removing Williams Communications Group's mounting losses
and rising expenses from Williams Companies' balance sheet. Through causing, allowing or failing
to correct the misrepresentations and omissions described below, Defendants breached their
fiduciary duty to disclose complete and accurate information regarding Williams Companies stock,
one of the investment options in the Plan. This duty includes both a negative duty not to misinform,
and an affirmative duty to inform when the fiduciary knows or should know that silence might be

AMENDED COMPLAINT - 19

harmful. Additionally, through causing, allowing or failing to correct misrepresentations and omissions described below, Defendants breached their fiduciary duties to monitor Williams Companies stock and ensure that it is a prudent investment, and breached their fiduciary duty to avoid conflicts of interest.

45. On March 1, 1999, Defendant Williams Companies issued a press release to investors, including employee investors, announced that its 1998 pre-tax income would be adjusted downward by $21.2 million.

46. On July 24, 2000, Williams Companies issued a press release on behalf of itself and its subsidiary, Williams Communications Group, which announced that the Board of Williams Companies intended to separate the energy-related businesses (Williams Companies) from the communications businesses (Williams Communications Group) within 18 months, subject to certain limited contingencies, as follows:

> *The Board of directors of Williams on Sunday authorized management to pursue a course of action that, if successful and approved by the board, would lead to a complete separation of the company's energy and communications businesses.*
>
> [Defendant Bailey], said that while the specific course of action has not been determined, it is envisioned *the process would take no more than 18 months.* He said any change from the current ownership structure would be contingent upon a number of factors, including ensuring favorable tax treatment for Williams" shareholders.

In addition to announcing the spinoff, defendant Bailey used this release to condition investors, including employee investors, to believe that the stock distribution was being undertaken to allow *both* Williams Companies and Williams Communications Group to be able to have more "efficient and effective access" to capital and that the spin-off was not a means by which Williams Companies

AMENDED COMPLAINT - 20

was foisting its non-performing subsidiary onto its shareholders, thereby avoiding massive write-downs, cost and expenses, as follows:

> "We believe these steps are *the best way to ensure that both our energy and communications businesses have the efficient and effective access to the capital necessary to pursue the substantial growth opportunities that each enjoys*," [Bailey] said. Obviously the ability to do that is consistent with *the best longterm interest of our shareholders*.

47.     In the statements contained in the July 24, 2000 release, Defendants Bailey and Williams did not disclose that the spinoff was not in the best interest of both Williams Companies and Williams Communications Group, as the primary motivation for the spinoff of Williams Communications Group was to allow Williams Companies to shore up its balance sheet so that it could then issue more stock and/or debt to acquire companies using its common stock as currency and protect its debt rating.    Additionally, these Defendants did not disclose that Williams Communications Group was operating at levels well below company sponsored expectations, such that revenue projections were overstated, and costs and expenses were understated, and also such that, in an effort to control costs, Defendants would soon have to take actions which would have a further adverse impact on Williams Communications Group's profitability.    Furthermore, these Defendants did not disclose that the spinoff actually exposed shareholders of the companies to significant additional undisclosed risks and uncertainties. By causing, allowing, or failing to correct these omissions, Defendants breached their fiduciary duty to disclose complete and accurate information regarding Williams Companies stock and the planned issuance of Williams Communication's stock, two of the Plan investment options. Additionally, Defendant members of the Benefit Committee and the Investment Committee breached their duty to monitor Williams Company stock and ensure that it was a prudent investment for the Plan.

48.     During 2Q:00, energy prices soared as natural gas traded on the New York Mercantile Exchange at prices above $3.75 per thousand cubic feet – up 47% compared to year-ago prices.

AMENDED COMPLAINT - 21

Rising prices also had a dramatic positive effect on the financial results of Williams Companies, which on July 28, 2000 issued a release announcing that purported quarterly profits had more than quadrupled, as second-quarter net income rose to $351.8 million, or 78 cents per share, on a diluted basis, and as segment profit from Williams Companies' energy businesses more than doubled that of the same period the prior year, driven primarily by higher income from electric power activities and continued improvement in key energy markets. In addition to the foregoing, Defendants also used this release to further condition investors, including employee investors, to believe that Williams Communications Group was poised to reap substantial gains from the sale of broadband and related services as well as the purported reasons for the spin-off, as follows:

> "As our communications business reported yesterday, *we are entering the stretch run in deploying the country's largest next-generation fiber-optic network, with completion scheduled for year end.* Network revenues are growing, and the continuing expansion of our book of business further validates the demand for value-added broadband products and services."

* * *

> *The advantages of keeping the business together*, such as giving Williams Communications access to construction expertise and rights of way, *will be almost exhausted once the unit's network is completed later this year, Bailey said.*

49.    In this press release, Defendants caused, allowed or failed to correct the misstatement that the true reason for the spinoff was not the result of a lack of Williams Communications Group's dependence on Williams Companies going forward, but was rather Williams Companies' desire to drop Williams Communications Group before its true impaired financial condition became known to investors, and before Williams Companies would have to take a massive charge related to the ownership of Williams Communications Group. Through causing, allowing or failing to correct the dissemination of this misinformation, Defendants breached their fiduciary duty to disclose complete

and accurate information regarding Williams Companies stock, and Williams Communication Group stock upon its issuance two of the Plan investment options. They also breached their duty to monitor Williams Companies stock and ensure that it was a prudent investment for the Plan.

50.    In addition to reporting better than expected 2Q:00 results, the drastic increase in the price of natural gas and other energy commodities during this quarter further hastened Defendant Williams' urgency to dump Williams Communications Group, so that it could wipe the losses and expenses associated with its subsidiary off its balance sheet – expenses and losses which Defendants knew or recklessly disregarded were not going to be reduced or contained in the near-term – such that Williams Companies could then finance the purchase of energy supply companies, using both equity and debt, and then hedge these acquired reserves through Williams Companies' commodities trading operations. It was critical to Defendant Williams that these transactions occur as soon as possible in order for Williams to take advantage of the uncharacteristically high prices in the commodities markets, and in order to avoid disclosing that Williams Communications Group was in much worse financial and operational condition than was previously reported or announced.

51.    On August 6, 2000, Defendant Williams Companies issued a release published on *PR Newswire* which announced that the Internal Revenue Service had approved the tax-free nature of the spinoff of Williams Communications Group, which was required to occur within 12 months to preserve the IRS order. Defendant Bailey was quoted in this release, as follows:

> "This important ruling allows us to move forward with the assurance that, should our board ultimately approve the separation, it will be a tax-free event for our share-holders," said [defendant] Bailey. *"As our prior announcement made clear, tax treatment was an important predicate in the board's decision-making process.* We can now turn our attention to the myriad of other details that must be resolved prior to a final decision to move further down this path. *We would not expect to*

AMENDED COMPLAINT - 23

*make any progress reports as we move along, and we expect that our next formal communications on this matter will be when the board makes its final decision.*"

52.      On October 25, 2000, Williams Communications Group issued a release published on *PR Newswire* which purported to announce "record" setting results for 3Q:00, the period ended September 30, 2000, driven by "significant improvement was driven by record usage of fiber-optic capacity on Williams' next-generation long-distance network as it approaches completion at the end of 2000." In addition, the release stated the following:

> *Execution of Network Build Remains Full Year Ahead of Schedule*
>
> *Construction of Williams' domestic inter-city network remains one year ahead of the original schedule*, with 33,000 route miles connecting 125 cities due to be completed by year-end 2000. Through September, Williams as 30,500 route miles of installed fiber-optic cable. . .
>
> * * *
>
> *"With 27,000 route miles lit, Williams Communications is on track to be the nation's most efficient, cost-effective broadband network,"* said Frank Sample, president of the Williams Network. . . Construction to extend the edges of the Williams network directly to carrier customers is substantially complete in 11 cities, with 34 cities targeted for completion by the end of 2001 and 50 cities by the end of 2002.
>
> * * *
>
> Network Guidance
>
> *Williams Communications continues to target 20 percent sequential growth in recurring network revenue*, which excludes one-time dark fiber sales and revenue from PowerTel for the fourth quarter. When this expected growth is combined with strong third quarter capacity sales and *full-year dark fiber revenue of approximately*

AMENDED COMPLAINT - 24

*$70 million, full-year network revenue is estimated at $700 million, or about 10 percent greater than current analyst consensus. The company remains confident in its ability to meet current 2001 analyst estimates for total network revenue that range between $1.3 billion and $1.4 billion.* This reflects a 100 percent year-over-year growth in recurring revenue, 100 percent growth in PowerTel revenue and approximately $100 million in dark fiber-related revenue. *Consistent with these revenue expectations, the company is targeting the network being EBITDA-positive on an operational basis by the end of 2001.*

According to defendant Bailey:

"*Williams Communications is successfully executing and delivering on our plan* to provide the most efficient, innovative, scalable network services in North America – a full year ahead of schedule. Our customers recognize Williams' commitment to execute and deliver unparalleled broadband capacity, superior customer service and local-to-global network reach."

53.    In the October 25, 2000 press release, Defendants caused, allowed or failed to correct a misrepresented forecast of 20% sequential growth in recurring network revenue, when Williams Communications Group did not have the wherewithal to finance the company's capital expense budget such that Williams Communications Group would have to take massive cuts which would necessarily impact recurring network revenue. Additionally, Defendants caused, allowed or failed to correct the misrepresentation that total network revenues would grow to $1.4 billion or that Williams Communications Group could meet then current 2001 analysts' forecasts, during the time that Williams Communications Group did not have the wherewithal to finance the company's capital expense budget such that Williams Communications Group would have to take massive cuts which would necessarily impact recurring network revenue. Furthermore, Defendants caused, allowed or failed to correct the misrepresentation that as a result of its purported completion of its network

AMENDED COMPLAINT - 25

ahead of schedule, Williams Communications Group would now be in a position to control costs such that it could make certain cost reductions without reducing the company's ability to generate sufficient revenues from operations that it could fund its debt and continue to connect customers to its network, which it could not.   Finally, Defendants caused, allowed or failed to correct the misrepresentation that as a result of completing Williams Communications Group's broadband network the company would not be adversely affected by the significant over-capacity or over-supply which existed in the broadband market when, at that time, the company was already being adversely affected by the conditions which Defendants knew or recklessly disregarded then existed. By causing, allowing or failing to correct  these misrepresentations, Defendants breached their fiduciary duty to disclose complete and accurate information regarding Williams Companies stock and Williams Communications Group stock upon its issuance, two of the Plan investment options. Additionally, Defendants breached their duty to monitor Williams Companies stock and ensure that it was a prudent investment for the Plan.

54.    On October 26, 2000, Defendant Williams Companies issued a release published on *PR Newswire* which purported to announce results for 3Q:00, the period ended September 30, 2000, the company's "fourth successive quarter of year-over-year earnings improvement," which was driven by higher energy commodity prices, among other positive developments.

55.    On November 16, 2000, Defendant Williams Companies issued a release published on *PR Newswire* which announced that the Williams Companies Board had authorized company management to continue to pursue the tax-free spinoff of Williams Communications Group, as follows:

> ***Assuming market conditions and other factors continue to support today's action, the board would expect to vote during the first part of next year to set a record date***, the ratio of a share of Williams Communications stock that will be

issued for each share of Williams stock and to *direct the distribution of Williams Communications Group shares.*

"*This important step continues a process that we believe remains in the best long-term interest of our shareholders,*" said [defendant]Bailey. "Our energy and communications businesses have tremendous opportunities before them. *Creating the most effective and efficient access to capital will help fuel that growth, and we believe that can best be achieved by creating two independent businesses.*"

56.     Soon thereafter, on November 28, 2000, Defendant Williams Companies issued a special press release published on *PR Newswire*, which purported to announce that Williams Communications Group's fiber-optic network was "on schedule for year-end completion," as follows:

Mission Accomplished:     *Williams Communications' Visionary Network on Schedule For Year-end Completion.*

Just two years after announcing re-entry into the telecommunications marketplace, *Williams Communications announced today its 33,000-mile network is on schedule for year-end completion, with 31,000 miles installed and 27,500 miles lit.*

"In less than 45 days the hard work of our teams across the nation will come to fruition," said Frank Semple, president of Williams Communications' network unit. "The Williams network is perfectly positioned to handle large volumes of traffic from established and emerging carriers. Many carriers are transitioning from their own legacy networks to our visionary network. . ."

. . . *Williams Communications' fiber-optic network*, already the largest among non-legacy providers, *is a full year ahead of the original construction*

AMENDED COMPLAINT - 27

*schedule announced in 1998.* It is scheduled to reach 33,000 lit and operational route miles and 125 cities by the end of 2000. . .

57.    As commodity energy prices continued to trade above historical levels during the end of 2000, on December 26, 2000, Williams Companies announced that 4Q:00 profits would beat analysts' estimates, due in substantial part to gains in the company's energy trading unit.  That day, *Bloomberg* news service reported that Williams Companies was now expected to earn "well above" $0.17 per share in 4Q:00, substantially beating the average estimate of analysts polled by First Call/Thompson Financial.  The company didn't give a specific fourth-quarter forecast, but based on the release of this announcement shares of Williams Companies rose $4.56, or 14 percent, to $37.44 per share.

58.    Soon after raising guidance for Williams Companies' 4Q:00 results, on January 3, 2001, Williams Companies issued a press release published on *PR Newswire* which announced that the company expected to "meet or exceed 2001 Wall Street estimates," as follows:

> Williams said today that expanding earnings capacity in marketing and trading combined with the growth of its other energy businesses should enable the company to meet or exceed Wall Street's 2001 estimates of $1.26 per share for consolidated and $1.73 per share for energy-only results.
>
> * * *
>
> Williams Communications, which includes a leading-edge broadband network, single-source communications systems integration and multiple technology applications for business, *expects to produce 2001 network-related revenue that will be approximately $1.3 billion*, more than double that of recurring 2000 network revenues.  *Network EBITDA* (earnings before interest, taxes, depreciation and amortization) *is expected to be positive on a run-rate basis by year-end 2001.*

59.    Defendants caused, allowed or failed to correct the omission of the fact that they taken inadequate reserves to account for the massive debt guarantees which Williams Companies

would need to put in place prior to the spinoff, they would not have met analysts' expectations for 2001. Through causing, allowing or failing to correct this omission, Defendants breached their fiduciary duty to disclose complete and accurate information regarding Williams Companies stock and Williams Communications Group stock, two of the Plan investment options. Additionally, Defendants breached their duty to monitor Williams Companies stock and ensure that it was a prudent investment for the Plan.

60.    On or about January 8, 2001, in anticipation of the Williams Communications Group spin-off, Williams Companies reported in a filing with the SEC that it would be contributing to Williams Communications Group a promissory note in favor of Williams Companies of approximately $975 million, in exchange for additional shares of Williams Communications Group common equity, and that Williams Companies might also contribute certain physical assets, including a building under construction, in exchange for additional shares of Williams Communications Group equity. According to Williams Companies' filing, it was then "evaluating several credit support mechanisms to enable us to obtain the capital we need to allow us to continue to execute our growth and business strategy." This news had the immediate effect of boosting Williams Communications Group's bond prices. However, what the market did not know at this time was that Defendant Williams Companies had used this transaction as a means of providing Williams Communications Group with assets which Williams Communications Group would then sell back to Williams Companies at inflated prices at a later time. Unbeknownst to investors, including employee investors, Defendant Williams Companies had entered into this non-arms length transaction as a means of providing Williams Communications Group with sources of capital which, as a result of Williams Communications Group's impaired operations, Defendants knew Williams Communications Group would exhaust in the near-term.

61.    In addition to the financing transaction announced on January 8, 2001, on January 10, 2001 *Bloomberg* reported that the prior day shares of Williams Companies declined over 7 percent

after the company, faced with a cash shortage, moved to sell $1.2 billion of new stock. In addition, upon review of Williams' January 9, 2001 SEC filing made in connection with the offering, as of September 30, 2000 Williams Communications Group had only $152 million of borrowing capacity left on its $1.05 billion credit line, before leverage covenants would be violated. Williams Companies' cash position at year-end 2000 had also dropped significantly, to $225 million, from $1.9 billion in the year earlier period. In combination, the equity sales and announced debt forgiveness saved Williams Communications Group from having to raise cash by selling equity at what was then viewed as a "punishing discount" which would dilute Williams Communications Group shareholders and further drive down the price of Williams Communications Group shares, and instead allowed Williams Companies to effectively sell its own stock and pass the new equity through to Williams Communications Group in the form of debt forgiveness. The effect of these pre-spin-off transactions was to boost Williams Companies' ownership of Williams Communications Group while simultaneously bolstering Williams Communications Group's balance sheet, and reducing Williams Companies' debt ratio from the mid 60% range to the upper 50% range, more in line with its peers. This, and the January 8, 2001 transaction, however, substantially increased Williams Companies' risk of loss related to its Williams Communications Group obligations.

62.    On January 11, 2001, Fitch credit rating service issued a release published on *Business Wire* which announced that it had rated Williams Companies' $700 million 7.5% notes due 2031 and $400 million of 6.75 puttable asset term securities (PATS) "BBB." According to Fitch, contributing to Williams Companies' rating was the following: Williams Companies' pending spin-off of its remaining 85% interest in Williams Communications Group to shareholders has *positive credit implications for Williams Companies shareholders*. Under GAAP accounting, Williams Communications Group's $3.5 billion of outstanding debt is fully consolidated into Williams Companies but is legally non-recourse non-cross defaulted to Williams Companies. Following the

AMENDED COMPLAINT - 30

complete separation, Fitch believes that Williams Companies will have less of an economic incentive to support Williams Communications Group in a downside scenario as it will cease to maintain a controlling equity interest in Williams Communications Group. Therefore, Williams Companies creditors will be able to focus strictly on cash flows from the energy business (both pipelines and nonregulated) to service Williams Companies' remaining $7.6 billion of debt obligations.

63.     On January 12, 2001, *Bloomberg* reported that Williams Communications Group had filed a "shelf-registration" with the SEC to allow the company to sell debt, common and/or preferred equity from time to time in any combination or amount up to $2 billion. Based on this news, shares of Williams Communications Group rallied $1.88 to close trading at $19.50, up 11% on the trading day.

64.     On January 29, 2001, Williams Communications Group announced another reorganizing transaction ostensibly designed to equip Williams Communications Group to survive as a wholly independent company, which included the sale of Williams Communications Group's enterprise services business, Williams Communications Solutions, LLC ("Solutions") to Platinum Technologies Inc. ("Platinum"). In exchange for Williams Communications Group's largest revenue generating unit, contributing over $1.3 billion in revenues to the company during 2000, Platinum agreed to pay $125 million in cash at closing plus provide a $75 million note payable over 18 months, in addition to collecting certain accounts receivables for Williams Communications Group totaling $206 million, subject to a collection fee. In total, excluding Solutions Canadian assets, which were not sold to Platinum, Williams Communications Group stated that it expected to realize at between $350 - $450 in cash from the disposition of the entire Solutions segment. Despite the sale, however, Williams Communications Group was still forced to record a 4Q:00 loss from discontinued operations of up to $1.17 per share, which includes estimated losses at the time the business was sold. Following this announcement, shares of Williams Communications Group closed

at above $18.00 per share and Williams Companies stock closed above $39.00 per share, both stocks up marginally on this announcement.

65.     On February 5, 2001, Williams Communications Group issued a press release published on *PR Newswire* which announced that it had exceeded market expectations for 4Q:01 revenues from continuing operations. In addition to announcing these quarterly results, Williams Communications Group used this release to condition investors to believe that the Williams Communications Group network was sufficiently operational so as to drive revenues and profits by the time the spin-off occurred, as follows:

> Fourth Quarter Operational Highlights
>
> ***Network Completed Full Year Ahead of Schedule***
>
> Williams Communications completed its 33,000-mile next-generation network connecting 125 cities at the end of 2000 – within three years of the launch date of Jan. 5, 1998, and *a year earlier than scheduled*. . . Williams now owns nearly 39,000 route miles of fiber-optic network. . .
>
> \* \* \*
>
> ***Williams Communications*** *continues to remain confident in its ability to meet or exceed 2001 analysts' estimates for total network revenue that range between $1.3 billion and $1.4 billion*. . . Consistent with these revenue forecasts, the company expects to be EBITDA-positive on an operational basis by the end of 2001.

Following the publication of this release, shares of Williams Communications Group traded down $0.07 to close trading at $17.98 per share.

66.     On February 5, 2001, Williams Companies issued a release published on *PR Newswire* announcing purported results for FY:01 from continuing operations of $873.2 million, or $1.95 per share, up from $178 million, or $0.40 per share on a restated basis for 1999, as results

continued to be driven by strong demand for energy and high commodity energy prices.  In addition, the February 5, 2001 release quoted defendant Bailey, as follows:

> "As we enter 2001, we believe that our performance will meet the expectations of the financial community as the productive capacity that we have aggressively developed in each of our businesses delivers bottom-line results," [Bailey] said.  "Our recently completed equity offering is a major factor in providing the financial capacity for us to execute the growth strategy of each of our businesses."

67.    On February 13, 2001, *Bloomberg* news service reported that Williams Communications Group announced that its cash flow loss this year will be narrower than forecast partly because of the sale of the Solutions unit, as follows:

> After adjusting for costs from the Solutions unit that is being sold and the spinoff of Williams Communications from its parent, and excluding the Broadband Media unit and certain investments, *the company expects a narrower loss before interest, taxes, depreciation and amortization than analysts have estimated, it said without giving a specific forecast.*

> The Solutions unit designs, installs and manages communications networks for businesses, Williams Communications plans to sell the unit's U.S. and Mexican operations this quarter.  The Canadian operations will be sold later in the year, the company said last week.

> Any additional assets would be sold before the spinoff from William Cos., the No. 2 U.S. natural-gas pipeline operator.  The spinoff is expected in the first half. . .

> * * *

> Capital spending this year is expected to be $1.8 billion to $2.0 billion, the company said.  That's "a couple hundred million" below the previous forecasts."

68.    On February 15, 2001, *TheStreet.com* reported on the statements made by Williams Communications Group at a Wall Street analysts' conference, as follows:

> Williams Communications keeps promising it will ride the crest of the bandwidth market, and observers at a conference Thursday seemed inclined to agree. The Tulsa, Okla., company which puts fiber in the diets of telecommunications providers made a presentation Thursday morning to investors and analysts at the Wall Street Analysts Conference in New York. ***The company tried to dispel what it called the myth of a coming bandwidth glut,*** promoted its recently completed next-generation 33,000-mile network and even waxed poetic about its baseball like tech-farm system.
>
> ***But perhaps most notably, Williams stood firm on what many observers are most concerned about: the health of its balance sheet. "We believe we are on a clear path to profitability.*** We have a sound funding strategy in place.
>
> The Cash Question
>
> Indeed, in these economically softening times, you don't need to be a pessimist or a skeptic to worry if debt-heavy network spenders like Williams will manage to stay afloat. ***Finding cash a little hard to come by last year, the company trimmed its network spending and liquidated its stake in Sycamore Networks. But this week, the communications arm, which expects to be spun off from its parent during the first half of the year, reaffirmed its goals of producing operating earnings before interest, taxes, depreciation and amortization, or EBITDA, by the end of the year. . . Williams also forecasts full-year 2001 network revenue of $1.3 billion to $1.4 billion.***
>
> As for 2001 consolidated expenditures, Williams expects to spend $1.8 billion to $2 billion, with about $1.5 billion targeted to its network projects. Thursday

AMENDED COMPLAINT - 34

morning, *the telecom company emphasized it sees a "tremendous shift" in 2001 spending from last year, during which spending went forward laying its "base capabilities" and as a result was "highly nondiscretionary." It said it expects discretionary capital spending to hit 50% this year and to exceed 70% over the next few years."*

   *"I expect that in the future years spending will continue to decline,"*

* * *

   Outlining a range of funding options in the pipeline, the company said it is confident of getting about $3.5 to $4 billion – above its projected needs. *Among its main funding sources will be a $1 billion loan and an undetermined amount from stock issuance for asset purchases from Williams Cos. Issuing a structured note, engaging in sale-and-leaseback transactions and increasing its commercial bank facility will also offer more flexibility, Williams said.*

   69.   On February 27, 2001, *Bloomberg* reported that Williams Communications Group announced that it was arranging a $950 million add-on loan to add to its $1.05 billion credit facility. According to *Bloomberg*, the company's add-on credit facility includes a $500 million term loan offered to institutional investors, with a yield 3.5 percent more than the London interbank offered rate, or Libor. Subsequent to this announcement, the yield was raised to Libor +4% as a result of the inability of Williams Communications Group to attract lenders at lower rates of return.

   70.   The following day, on February 28, 2001, *TheStreet.com* issued a follow-up article on Williams Communications Group which reported on its latest round of financing, as follows:

   Williams Communications is exchanging stock for assets, including an intercompany note, with its parent and largest shareholder, energy company Williams.

   *Williams Communications which provides voice, data, Internet and video services to communications service providers, will issue 24.3 million additional*

AMENDED COMPLAINT - 35

*shares to Williams, which then will own 420 million shares, or 86%, of the unit's stock, up from 85% before the transaction.*

*Williams Communications will purchase its outstanding promissory note from Williams Cos. and acquire other physical assets, including the 15-story, 750,000-square-foot Williams Technology Center, which, when completed, will sit adjacent to Williams Cos.' headquarters tower.*

\* \* \*

Williams Cos. said "this is another key step in executing the financing plan the we have previously outlined. . .

In addition, at this time defendant Bailey was also quoted as stating, that:

"We are also evaluating other credit support mechanisms to enable Williams Communications to obtain the capital to fully execute its business strategy," Bailey said.  "Coming out of this transaction with two strong companies capable of continued rapid growth is the primary reason we started down this path last year."

71.    In connection with the announcement of this asset/equity swap between Williams Companies and Williams Communications Group, on March 1, 2001, *Tulsa World* reported the following:

Williams spokesman Jim Gipson said that at the time the boards of directors of the two companies agreed to the swap in mid-January, Williams Communications stock was selling between $19 and $19.50 a share.  At the mid-point of that range, the value of the newly-issued stock would be about $467 million.  At the time this transaction was closed, however, shares of Williams Communications Group were trading at $12.46 per share and shares of Williams Companies were trading at $41.70 per share.

AMENDED COMPLAINT - 36

72.     On March 9, 2001, Fitch credit rating service, in affirming Williams Communications Group's senior unsecured debt rating at "BB-," stated the following:

This rating action follows a series of announcements and anticipated closing of several financial commitments by Williams Communications Group and its parent, The Williams Company, in preparation of an expected tax-free spin-off.   By recapitalizing the company and increasing its financial flexibility, Williams Communications Group will enhance its ability to pre-fund its current growth plan to reach free cash flow.

In January 2001, Williams Communications Group filed a shelf registration statement to raise as much as $2 billion and use the proceeds for network expansion, working capital, and general corporate purposes.   The Williams Company is evaluating several credit support mechanisms with contingent equity commitments enabling Williams Communications Group to obtain financing on more favorable terms.  Also in January, Williams Communications Group announced the proposed sale of its Solutions business unit, with expected proceeds of approximately $400 million.   By selling Solutions, which had been a drain on cash flow in the past, Williams Communications Group can focus on operating and growing its core broadband network business.

Additional significant transactions include the debt-to-equity conversion of the company's $950 million inter-company loan, the expansion of its senior credit facility to $2 billion, a potential Algar Telcom Leste S.A. (ATL) sale, and an expected private equity investment as part of a strategic alliance. *While Williams Communications Group started the year with a funding gap, the above transactions, along with its current liability position of over $1 billion, provide Williams Communications Group with more than $4 billion of funding. Assuming*

*all financial commitments complete as expected, the funding risk to the company is effectively reduced into 2003 and possibly beyond.*

\* \* \*

*A number of operational uncertainties which existed at the time of the IPO have been removed as the company transitions from the construction phase to operation of its network.* Due to the significant build-out completed last year, Williams Communications Group must increase utilization of its network to achieve better efficiencies from network assets and improve EBITDA margins. Williams Communications Group will use the revenue ramp of its high quality recurring customers to drive results for 2001. By the end of the year, Williams Communications Group expects to be EBITDA positive. *Since the network is built out, capital expenditures are highly discretionary and success-based, providing more flexibility within Williams Communications Group's business plan.*

73. According to a *Bloomberg* news service report issued the same day, the Fitch rating came after Williams Communications Group agreed to pay even higher yields and other incentives. According to the *Bloomberg* report, Williams Communications Group granted these enhancements after J.P. Morgan Chase & Co. and Bank of America Corp., the company's biggest lenders, refused to loan more money to Williams Communications Group because they were already "loaded down with loans to the company." Also according to *Bloomberg*, banks have been hurt by the falling value of many telecom loans, making them reluctant to extend money, and especially following the *Bloomberg* Index of U.S. telecommunications services companies having fallen 42% during the past year. What's more, *Bloomberg* reported that many fund managers aren't willing to buy new loans from telecom companies because they already hold so much of their debt.

74. On March 15, 2001, Williams Communications Group issued a release published on *PR Newswire* which announced the company's private placement of $1.4 billion in structured notes, as follows:

AMENDED COMPLAINT - 38

Williams Communications Group announced today the Williams Communications Group Note Trust, a special purpose subsidiary, intends to issue $1.4 billion structured notes due 2004 in a private placement by the end of the month. The proceeds will be used for capital spending on telecommunications assets.

*Williams* (NYSE:WILLIAMS COMPANIES) owns approximately 86 percent of Williams Communications' outstanding shares and *is providing indirect credit support for the structured notes through a commitment to issue Williams' equity in the event of a Williams Communications Group default. . .*

75.    In rating Williams Communications Group's $1.4 billion Note Trust a "BBB-," Fitch credit rating service provided more detail on Williams Companies' credit support, as follows:

*The support for the rating comes from a pre-funded six-month interest reserve and contingent equity commitment from Williams Companies.* The interest reserve (approximately $55 million) will be invested in Williams Companies senior unsecured demand loans and will be available for debt service on the Notes in the event Williams Communications Group fails to pay interest on the underlying Williams Communications Group Notes. . .

While multiple principal repayment sources are available, including either repayment or sale of the Williams Communications Group Note..., *Noteholders should view Williams Companies' support and equity commitment as the fundamental basis for the "BBB-" rating. Upon a Note trigger event and subject to certain standstill periods, the share trustee will remarket the Williams Companies mandatory convertible preferred stock on terms that are designed to generate proceeds sufficient to redeem the Notes in full. In the event that the issuance of the preferred securities yields less than the amount due under the Notes, pursuant to the Share Trust Agreement, Williams Companies is required to deliver additional preferred shares (or common stock) for sale until at least $1.4 billion has been*

raised. *If Williams Companies does not deliver under this obligation, the difference between the principal due on the Notes and the amount raised becomes a contract claim against Williams Companies.* Such obligation would represent a general unsecured claim against Williams Companies. *Importantly, Williams Companies' obligations under the Share Trust Agreement remain enforceable in the event Williams Communications Group is ultimately spun-off.*

76.    On March 30, 2001, the penultimate day of the first quarter, Williams Companies issued a release filed with the SEC pursuant to Form 8-K which announced that the Williams Companies board approved the tax-free spin-off of Williams Communications Group, as follows:

*Williams announced today that its board of directors approved a tax-free spinoff of the company's communications business to Williams' shareholders.* The spinoff will be in the form of a dividend. Williams will distribute approximately 400 million shares, or about 95 percent of the Williams Communications common stock it currently owns, *to holders of Williams common shares on the record date, which is 5 p.m. Eastern time on April 9. Distribution is to occur April 23.*

In addition to announcing the spin-off, defendant Bailey used the press release to condition investors to believe the following:

"*Today's decision brings to a conclusion an effort that began last summer. That is when our board began an analysis of whether separating Williams and Williams Communications would best enable each to reach its full potential and to most effectively access capital markets,*" said [defendant] Bailey.

"Obviously, the capital markets are very different today than when we began pursuing this objective, but the conclusion is obvious," he said.  "With sufficient capital on hand to meet its needs well into 2002 and its next-generation network completed and open for business, *we believe Williams Communications is poised to deliver on its great potential.*

77.    On April 10, 2001, the board of Williams Companies announced that they had set the ratio for distribution ratio, pursuant to which shares of Williams Communications Group would be spun off to Williams shareholders.  According to the Williams Companies board, each shareholder of the company on the record date, April 9, 2001, would receive .822399 shares of Williams Communications Group for each Williams Companies share held at the close of trading.

78.    On April 19, 2001, only days before the spin-off distribution date, Williams Communications Group issued a release published on *Business Wire*, which responded to Winstar Communications Inc.'s April 18, 2001 filing for Chapter 11 bankruptcy protection, stating that this event would not have a "significant cash impact in 2001," as follows:

> Williams Communications Responds to Winstar Bankruptcy, Reaffirms First Quarter 2001 Revenue Guidance; Expects to Report EBITDA Results Favorable to Previous Guidance

> In 1998, Williams Communications entered into a $400 million agreement with Winstar for a 25-year commitment to use approximately two percent of the wireless local capacity of Winstar.  Under the agreement, Winstar is to construct 270 wireless hubs by the end of 2001.  As of March 31, 2001, Winstar had delivered 200 hubs, or antenna sites, to Williams Communications for which it has paid approximately $300 million.  Previously, the company estimated that it would pay an additional $100 million for the delivery and acceptance of the remaining 70 hubs Winstar is committed to deliver.  Williams Communications is not required to pay the additional $100 million if the remaining hubs are not delivered and accepted.

> *. . . Williams Communications has not yet fully integrated this wireless capacity into its fiber service offerings and does not expect that any such idling of the wireless hub assets would impact its marketing business plan or product offerings in 2001.*  Moving forward, Williams Communications is prepared to adjust

AMENDED COMPLAINT - 41

its product offering plans for subsequent years to compensate if these wireless assets are lost.

* * *

Although a number of uncertainties exist in any bankruptcy and the rights and obligations of Winstar and its creditors will be determined over time in the bankruptcy court, ***Williams Communications believes that its net cash position and accounts receivable exposure relative to Winstar, when taken as a whole, will not have a significant cash impact in 2001. Williams Communications has not altered its expectations that it will be EBITDA positive on an operational basis by the end of 2001.*** In addition, Williams Communications reaffirms its first quarter revenue guidance and report EBITDA results that are favorable to previous guidance.

79.     In the April 19, 2001 press release, Williams Communications Group omitted that at the time of the Winstar bankruptcy filing, market conditions had so far deteriorated in the broadband sector that it was impossible for Williams Communications Group to meet its financial goals for 2001 without substantially revising estimates to include massive cap-ex spending reductions and without making major reductions in the company's revenue forecasts. By causing, allowing or failing to correct this omission, Defendants breached their fiduciary duty to disclose complete and accurate information regarding Williams Companies stock and upon its issuance, Williams Communications Group stock, two of the Plan investment options. Additionally, Defendants breached their duty to monitor Williams Companies stock and ensure that it was a prudent investment for the Plan.

80.     On April 24, 2001, Williams Communications Group announced that effective at the close of business the prior day, April 23, 2001, Williams Companies completed its tax-free spin-off of Williams Communications Group in a distribution of 398.5 million shares to Williams Companies' shareholders of record as of April 9, 2001. In connection with the spin-off, defendant Bailey resigned from the Williams Communications Group board of directors.

AMENDED COMPLAINT - 42

81.    Within days of the spinoff, on April 26, 2001, Williams Companies issued a release published on *PR Newswire* which, after effectively divorcing its operating results from those of Williams Communications Group, announced that 1Q:01 results from "continuing operations" more than doubled on a year-over-year basis, as follows:

> Williams today announced unaudited first quarter 2001 *results from continuing operations of $378.3 million, or 78 cents per share, compared with a restated $138.9 million, or 31 cents per share, for the same period last year.*
>
> * * *
>
> "Based on this quarter's results and our view of the balance of the year, *we are again adjusting our estimate for 2001, anticipating results of from $2.10 to $2.20 per share,*" [Bailey] said.
>
> * * *
>
> Results of Williams Communications, which was spun off to shareholders earlier this week, are reported as discontinued operations.  Williams' prior-period consolidated financial results have been restated as a result of this transaction.
>
> * * *
>
> Editors note:  Unaudited consolidated net income the first quarter fro 2001, which includes the effects of discontinued operations, was $199.2 million, or 41 cents per share, compared with 22 cents per share for the same period last year.

82.    By deconsolidating its balance sheet Defendant Williams Companies created the false impression that it had already taken all necessary charges related to the spinoff of Williams Communications Group, when in fact Williams Companies had failed to create any reserve or make any allocation on its balance sheet for the $2.5 billion in credit guarantees which it had made for Williams Communications Group, and had also failed to disclose to investors, including employee investors, the true risks which resulted from guaranteeing Williams Communications Group's debt

AMENDED COMPLAINT - 43

as a result of the undisclosed, impaired condition of Williams Communications Group. By causing, allowing, or failing to correct this misrepresentation, Defendants breached their fiduciary duty to disclose complete and accurate information regarding Williams Companies stock and Williams Communications stock, two of the Plan investment options. Additionally, Defendants breached their duty to monitor Williams Companies stock and Williams Communications Group stock and ensure that they were prudent investments for the Plan.

83. Within one week of the spinoff of Williams Communications Group to shareholders of Williams Companies, on May 1, 2001, *Bloomberg* news service reported that Williams Communications Group had announced much wider than expected losses for 1Q:01, the period ended March 31, 2001 (the day after the spin-off was officially declared by the Williams Companies board), as follows:

> Williams Communications Inc. . . had a wider first quarter loss on costs related to its spinoff from pipeline company Williams Cos. *The loss widened to $302.2 million, or 65 cents a share after the payment of preferred dividends, compared with a loss from continuing operations of $86.2 million, of 18 cents, in the year-earlier quarter.*
>
> * * *
>
> The Tulsa, Oklahoma-based *company had been expected to post a loss of 55 cents, the average estimate of analysts by First Call/Thompson Financial.*

84. On May 1, 2001, in addition to the *Bloomberg* report, Williams Communications Group also issued a release published on *PR Newswire* which reiterated these results and which purported to provide the following guidance to investors, as follows:

> Although the current economic environment appears to be weakening, Williams Communications continues to see strong demand for bandwidth services. As capital becomes more difficult to obtain, many bandwidth-centric companies are

looking to Williams Communications as an alternative to investing heavily into their own network build-outs.

Williams Communications continues to remain confident in its ability to meet previous 2001 revenue guidance as adjusted for the potential loss of revenue associated with the Winstar contract. As previously disclosed, the bankruptcy filing of Winstar could impact network revenue by approximately $90 million. Accordingly, Williams Communications is adjusting previous 2001 revenue guidance to $1.2 - $1.3 billion to reflect this impact.

*. . . Williams Communications continues to project being EBITDA positive on an operational basis by the end of 2001.*

*. . .[T]he company has been able to reduce its 2001-2002 capital expenditures program from the $3.9 billion previously forecast, to $3.2 billion, and still achieve its long-term growth objectives.*

85. In the May 1, 2001 release, Williams Communications Group mistated that it was still on course to meet expected financial and operational forecasts, and that its above plan expenses were one-time expenses related to the spinoff and were not indicative of the impaired condition of the company. In fact, by this time Williams Communications Group was not operating according to company sponsored expectations and the higher costs were indicative of the operational and financial problems which existed at Williams Communications Group throughout the Class Period.

86. On May 1, 2001, Williams Companies was also forced to make a Regulation FD Disclosure filing with the SEC, after it was accidentally disclosed that company outsiders were mistakenly patched into a telephonic meeting of the company's board of directors, and learned that Williams Companies was considering a proposal to acquire Barrett. According to Williams Companies, the company made its Reg. FD filing, "the disclosure of the purpose of the meeting to three outside individuals was non- intentional. No terms of any potential proposal were disclosed, nor was any action of the Board of Directors disclosed."

AMENDED COMPLAINT - 45

87.     Later, on May 7, 2001, Williams Companies issued a release published on *PR Newswire* which announced that it had signed a definitive merger agreement with Barrett, pursuant to which Williams Companies would acquire all of the assets of Barrett in a cash and stock transaction valued at approximately $2.8 billion, including the assumption of approximately $300 million in debt, as follows:

> The terms of the merger agreement, which was approved by both companies' Boards of Directors, provides for Williams to promptly commence a first-step cash tender offer of $73.00 per share for 50 percent of the outstanding Barrett common stock, followed by *a second-step merger with a fixed ratio of 1.767 shares of Williams common stock for each remaining share of Barrett common stock. . .*
>
> *The transaction is valued at $1.34 per thousand cubic feet of proved gas equivalent reserves and would more than double Williams' proved natural gas reserves,* while significantly enhancing its ability to profitably grow its power business. The cash offer represents a 60% premium to Barrett's price on 3/6/01, the day before the first unsolicited offer was made to acquire Barrett.

88.     On May 25, 2001, after stating that Williams Communications Group may be looking for a private equity investment of up to $250 million, the *Tulsa World* reported the following:

> Williams Communications Group Inc. would like to find a major network customer interested in purchasing a stake in its system, company executives said Thursday.
>
> However, they said, the company is not cash-poor nor does it need investment or operating capital.

89.     On June 4, 2001, Williams Communications Group shares fell 10.7 percent to hit a then record low of $3.85 per share, after *Barron's* reported that analyst Robert Gensler, manager of the year's top performing telecommunications fund, stated that *Williams Communications Group*

AMENDED COMPLAINT - 46

*would either go out of business or file for bankruptcy protection within the next few years.* On June 5, 2001, *The Daily Oklahoman* reported the following:

> Company officials and analysts agreed that investors were likely reacting to bearish comments made by an analyst in this week's *Barron's*. Robert Gensler, manager of the year's top-performing telecommunications fund, grouped Williams Communications with a broadband provider for the Internet industry – and painted a dim picture for both.
>
> * * *
>
> *Williams Communications dismissed the comments as "one analyst's opinion,"* saying the company is destined to emerge as one of the few survivors in the telecom industry. . .
>
> "Once people get under the hood and really look at our company, they'll see that we're much better positioned than almost all the telecom carriers out there," said a representative for Williams Communications.
>
> * * *
>
> However, at least one analyst – *Michael Hodel of Morningstar – expressed some caution about the financial condition of Williams Communications. He described Williams Communications as "one of the more heavily leveraged telecom companies out there."*
>
> After the most recent stock decline, Williams Communications Group shares were down 90.5% from the stock's 52 week high of $40.63.

90.     On June 17, 2001, *Bloomberg* reported a story broken by the *Orange County Register* which concluded that, after an analysis by the paper based on federal smoke-stack output logs, state power-grid records and regulatory filings, *Williams Companies had cut California plant output during shortages, and then boosted production only when grid operators agreed to pay more for*

AMENDED COMPLAINT - 47

*power*. *Bloomberg* also reported that Williams Companies had offered financial incentives to operators who supplied power for Williams Companies to extend maintenance outages at generators, allowing the company to sell power from other units at higher prices. Also, according to *Bloomberg*, this artificial price inflation was allegedly responsible for contributing materially to over $1 billion in profits earned since 10/00. *Bloomberg* also reported that while Williams Companies had sold power at many times cost, ran AES plants at less than full power during shortages and discussed financial incentives with plant operators, the company maintained that it did not break the law. Despite Williams Companies' contention that it did not break the law, however, by this time the company had become the subject of a United States Department of Justice Investigation for violations of federal antitrust laws, and Williams Companies was subject to tens of millions of dollars in fines and civil penalties.

91.    By June 19, 2001, after Williams Communications Group's nearest competitor, Level 3 Communications Inc., announced that it would cut 24% of its workforce in response to a "slowing economy," investors and traders bid down the price of Williams Communications Group's debt to a mere 36 cents on the dollar – indicating that investors believed that the company would default on its payments, only one day after shares of Williams Communications Group fell an additional 12.5% to a new 52-week low of $2.75 per share. Despite reports at this time that the industry was "crippled" by an oversupply of fiber-optic networks and a shortage of customers, *Williams Communications Group again stated that "no layoffs" at the company were planned* (quoting *The Daily Oklahoman*, 6/19/01).

92.    In addition to the foregoing, within several weeks, as Williams Communications Group's debt continued to trade at significantly reduced levels, in line with the debt of some firms that have since filed for protection from creditors, the *Rocky Mountain News* reported that these declines were due in substantial part to investors beliefs that the "loss ridden" company is increasingly unlikely to meet scheduled bond payments. Moreover, according to the *Rocky*

*Mountain News*, several money-losing companies similar to Williams Communications Group, such as Teligent Inc., Viatel Inc., PSINet Inc., Metricom Inc., and 360Networks Inc., had all slid into bankruptcy after stumbling as competition, slack demand, and a slowing U.S. economy stifled revenue growth and made investors less willing to provide additional capital.

93.    According to Merrill Lynch & Co., in the April-June quarter their index of high-yield telecom company bonds, which includes Level 3 and Williams Communications Group and other telecom firms, showed telecom debt had fallen by 18%, and in the first 6 months of 2001 had fallen 21%, including an 11% decline in June alone – their second biggest decline all year. *Despite the obvious signs of Williams Communications Group's financial instability, and the questions surrounding WEC's ability to meet its debt covenants and service its debt, at this time Williams Companies made no adjustments to its balance sheet to account for the WILLIAMS COMMUNICATIONS GROUP loan guarantees, and the fact that now Williams Communications Group faced a substantial likelihood of a default.*

94.    Despite the company's repeated denials, the last as late as June 19, 2001, on June 28, 2001 Williams Communications Group announced that it would *cut up to 500 jobs*, which the company deemed "necessary" after re-evaluating costs. The same day, the *Tulsa World* reported the following:

> *Williams Communications Group Inc., which has insisted for months that its cash position is strong and its employees base solid amid an anemic technology sector and its plunging stock price, will cut several hundred positions beginning on Monday.*

95.    In connection with the acquisition of Barrett by Williams Companies, on June 28, 2001, Williams Companies filed with the SEC a false and materially misleading Registration Statement which materially misrepresented material facts and which omitted to disclose facts necessary to make the statements contained therein not false and materially misleading.

AMENDED COMPLAINT - 49

96.    In the Risk Disclosure section of the Registration Statement, under the heading, "Williams may be subject to liabilities pertaining to its spin-off telecommunications business unit," the Registration Statement stated that Williams Companies maintained an indirect credit support for Williams Communications Group of $1.4 billion, as follows:

> . . .*Williams is providing indirect credit support for $1.4 billion of Williams Communications' structured notes* through a commitment to issue Williams equity in the event of a Williams Communications default, or to the extent Williams Communications' refinancing or remarketing of certain structured notes prior to March 2004 produces proceeds of less than $1.4 billion. The ability of Material Adverse Change is defined in the Merger Agreement as, "any change or effect (or any development that, insofar as can reasonably be foreseen, is likely to result in any change or effect) that is materially adverse to the business, properties, assets, condition (financial or otherwise) or results of operations of [Barrett] and its Subsidiaries taken as a whole, or [Williams Companies] and its Subsidiaries taken as a whole, as the case may be."

> Williams Communications to make payments on the notes is dependent on its ability to raise additional capital and its subsidiaries' ability to dividend cash to Williams Communications. Williams Communications, however, is obligated to reimburse Williams for any payment Williams may be required to make in connection with these notes.

97.    No other disclosures regarding Williams Companies' credit obligations in favor of Williams Communications Group were disclosed in the Registration Statement. Rather than disclose that Williams Companies would have to support at least $2.5 billion of Williams Communications Group debt and that Williams Communications Group was operating well below company sponsored guidance, the Registration Statement represented and warranted that all necessary disclosures were

*already* made and that no material adverse events had occurred between the signing of the Merger Agreement, on May 7, 2001 and the time of the closing of the merger in August 2001, as follows:

> In the merger agreement, Williams Companies has made representations and warranties relating to, among other things; SEC filings, the absence of material adverse changes, accuracy of information supplied, compliance with applicable laws and regulations.

* * *

> Section 5.5 SEC Documents and Other Reports.  Parent has filed with the SEC all documents required to be filed by it since April 1, 1998 under the Securities Act or the Exchange Act (the Parent SEC Documents).  *As of their respective filing dates, the Parent SEC Documents complied in all material respects with the requirements of the Securities Act or the Exchange Act, as the case may be, each as in effect on the date so filed, and at the time filed with the SEC none of the Parent SEC Documents contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.*  The financial statements of Parent included in the Parent SEC Documents comply as of their respective dates in all material respects with the then applicable accounting requirements and the published rules and regulations of the SEC with respect thereto, have been prepared in accordance with GAAP (except in the case of the unaudited statements, as permitted by Form 10-Q under the Exchange Act) applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto) and fairly present the consolidated financial position of Parent and its consolidated Subsidiaries as at the dates thereof and the consolidated results of their operations and their consolidated cash flows for the

AMENDED COMPLAINT - 51

periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments and to any other adjustments described therein).

98.     In regard to the disclosure of Williams Companies' liabilities, the Registration Statement stated the following:

> Except as set forth above or in Item 5.3 of the Parent Letter, as of the date of this Agreement, there are no securities, options, warrants, calls, rights, commitments, agreements, arrangements or undertakings of any kind to which Parent or any of its Significant Subsidiaries is a party or by which any of them is bound obligating Parent or any of its Significant Subsidiaries to issue, deliver or sell or create, or cause to be issued, delivered or sold or created, additional shares of capital stock or other voting securities or Parent Stock Equivalents of Parent or of any of its Significant Subsidiaries or obligating Parent or any of its Significant Subsidiaries to issue, grant, extend or enter into any such security, option, warrant, call, right, commitment, agreement, arrangement or undertaking.

* * *

> Section 5.11 Liabilities.   Except as set forth in the Parent Filed SEC Documents, *neither Parent nor any of its Subsidiaries has any liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise) required by GAAP to be set forth on a consolidated balance sheet of Parent and its Subsidiaries or in the notes thereto, other than liabilities and obligations incurred in the ordinary course of business since December 31, 2000* and liabilities which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Parent.

99.     Importantly, the Background to the Merger section of the Registration Statement outlined the critical period during which the representations and warranties were operative, and the period to which those representations and warranties pertained, as follows:

AMENDED COMPLAINT - 52

Williams Companies Evaluates Possible Combination

Several Months Prior to mid-3/01 Barrett Resources was one of the potential acquisition candidates identified in that process.

Following Shell Oil Co's 3/1/01 Unsolicited Tender, Barrett Seeks Other Offers

Following the March 8, 2001 board meeting, Barrett Resources immediately began a process for seeking business combination proposals from qualified parties. The company's financial advisors, Goldman, Sachs & Co. and Petrie Parkman & Co., Inc., contacted approximately 45 parties worldwide on behalf of Barrett, including Williams. In addition, Robert Buford, a director of Barrett and an acquaintance of defendant Bailey, contacted him to invite Williams Companies to enter the bidding process.

Mid-3/01 to 5/2/01 Williams Companies Conducts Due Diligence

Commencing in mid-March 2001 and continuing through May 2, 2001, Williams Companies and its representatives visited Barrett and conducted a due diligence review of the business and financial condition of Barrett. Defendant Bailey and other representatives of Williams Companies held several discussions with representatives of Barrett (including Mr. Buford) about Williams Companies' interest in Barrett and Barrett's strategic fit with Williams Companies. Similar reviews and discussions were taking place during this period with other parties which had signed confidentiality agreements. On 5/2/01, Barrett set the deadline for other interested parties participating in the bidding process.

On 5/1/01, Negotiations Mistakenly Disclosed During Conference Call

On 5/1/00, Williams Companies board together with its financial advisors, held a telephonic meeting for the purpose of considering the authorization of an acquisition proposal for Barrett. At the beginning of the meeting, outside individuals were mistakenly connected by a conference call vendor. Before this error was

AMENDED COMPLAINT - 53

discovered, officers of Williams Companies stated that the board meeting had been called to consider the proposal to acquire Barrett.  As a result of this unintentional, inadvertent disclosure, Williams filed a Form 8-K disclosing this event on 5/1/01.

Williams Companies Offers $71 on 5/2 and $73 on 5/5: Half Stock, Half Cash

On 5/2/01, three parties including Williams Companies delivered proposals to acquire all of the outstanding shares of Barrett.  Williams Companies submitted a proposal at a price equivalent to $71.00 per share that provided for the purchase of one-half of the shares pursuant to a cash tender offer followed by a merger in which each remaining share would be exchanged for shares of Williams common stock at a fixed exchange ratio to be determined based on the average closing prices of Williams Companies common stock for the ten consecutive days preceding the execution of a merger agreement

On the afternoon of 5/5/01, both Williams Companies and another company responded Barrett's request for improved offers and Williams Companies increased the value of its proposal to $73.00 per share, while maintaining the structure and other terms set forth in its initial proposal.  The second company did not change its originally proposed price.  That evening, Barrett's financial advisors informed Williams Companies that it was the prevailing bidder.  On May 14, 2001, Williams commenced the tender offer for 16,730,502 shares of Barrett Resources common stock.

100.    Based on the reassurance that no material adverse events had occurred during the relevant period preceding the Barrett acquisition, the Registration Statement also stated that the consideration received by Barrett's shareholders was fair from a financial perspective, as follows:

. . .The Barrett Resources board reviewed carefully the proposals received on the publicly announced May 2, 2001 deadline and the results of further negotiations with the two parties presenting the highest proposals. *The Barrett Resources board*

AMENDED COMPLAINT - 54

*noted that the Williams proposal, based on the closing price of Williams common stock on May 4, 2001* (the last trading day before the execution of the merger agreement), *offered the highest value of any proposal that it received,* although the Barrett Resources board was aware that the Williams common stock price might be adversely affected, at least temporarily, by the announcement of the execution of the merger agreement.

* * *

*The opinion of Goldman Sachs delivered to the Barrett Resources board on May 7, 2001, that, as of that date, and based upon and subject to the various qualifications and assumptions described in its opinion, the consideration to be received by the holders of shares of Barrett Resources common stock in the tender offer and the merger, taken as a unitary transaction, was fair from a financial point of view to the holders of such shares receiving such consideration.*

Implicit in the valuation assumptions utilized to assess the value of the stock portion of the Merger consideration, was the assumption that shares of Williams Companies were not artificially inflated at that time.

101.    With the exception of the Background to the Merger section contained in the Barrett acquisition Registration Statement, which are presumably accurate and which show that Defendants were considering the acquisition of Barrett at least from the inception of 2001, Defendants caused, allowed or failed to correct the following misrepresentations:

(i)    that Williams Companies provided "credit support for $1.4 billion of Williams Communications' structured notes," when in fact at the time of the merger Williams Companies had guaranteed upwards of $2.5 billion in Williams Communications Group debt;

(ii)    that either Williams Companies SEC filings were compete and up to date, or that no material adverse event had occurred the disclosure of which was required to make such statements not false and materially misleading when Defendants had failed to disclose that, as a

AMENDED COMPLAINT - 55

result of the impaired operational and financial condition of Williams Communications Group that Williams Companies had substantial and undisclosed risk of loss which Williams Companies had neither properly reserved for or adequately disclosed;

(iii)    that all of the company's SEC documents had been prepared and filed in conformity with Generally Accepted Accounting Principles, when Williams Companies' failure to either disclose the true risk of loss associated with its $2.5 billion in loan guarantees to Williams Communications Group or to properly reserve for these potential and probable losses;

(iv)    that as a result of the undisclosed liabilities related to Williams Companies' guarantee of Williams Communications Group's debt and the undisclosed risk of loss associated thereto, that the consideration offered in the merger offered to Barrett the highest value of any proposal received, when in fact the stock portion of this offer was artificially inflated as a result of Defendants' false statements and omissions.

102.    By causing, allowing or failing to correct these misrepresentations, Defendants breached their fiduciary duty to disclose complete and accurate information regarding Williams Companies stock and Williams Communications Group stock, two of the Plan investment options. Additionally, Defendant members of the Benefits and Investment Committees breached their duty to monitor Williams Companies stock and William Communications Group stock to ensure that they were prudent investments for the Plan.

103.    On July 30, 2001, Williams Companies issued a release published on *PR Newswire* which purported to announce results for 2Q:00, the period ended June 30, 2001, which stated the following:

Led by improved refining volumes and margins, higher natural gas production prices and a gain on the sale of convenience stores, Williams today reported unaudited second-quarter income from continuing operations of $339.5 million, or 69 cents per share on a diluted basis. This compares with $286.4 million, or 63 cents per share on a diluted basis, during the same period a year ago.

AMENDED COMPLAINT - 56

* * *

*As a result of current performance and outlook for the remainder of the year, Bailey said he now is comfortable with increasing previous earnings guidance for the full year to approach the current Wall Street consensus estimate of $2.32 per share.*

104.    As a result of the substantial risk of default to which Williams Communications Group had now become susceptible, Williams Companies was obligated to make certain reserves on its financial statement and balance sheet to account for its $2.5 billion in loan guarantees to Williams Communications Group.    Williams Companies' failure to make any adjustment to Williams Companies' financial statements or balance sheet rendered its financial statements unreliable and presented the financial condition of Williams Companies in a manner which did not present investors, including employee investors, with a fair and accurate portrayal of Williams Companies' finances or operations.  As such, defendant Williams Companies' financial statements for the 3Q:01 were not prepared in accordance with GAAP.  By causing, allowing or failing to correct these misleading financial statements and accompanying announcements Defendants breached their fiduciary duty to disclose complete and accurate information regarding Williams Companies stock, one of the Plan investment options.    Additionally, Defendants breached their duty to monitor Williams Companies stock and Williams Communications Group stock and ensure that they were prudent investments for the Plan.

105.    Desperate to mask that Williams Communications Group was floundering so soon after it was spun-off, on August 1, 2001, when the company announced results for 2Q:01 it took drastic measures to insure that it beat Wall Street's expectations by drastically cutting costs by over $1 billion, despite the long-term adverse effects these capital expenditure spending reductions would have on Williams Communications Group's ability to generate revenues and profits going forward. Thus, according to Williams Communications Group's release published that day on *PR Newswire*: *Having completed a mid-year review of capital expenditure requirements, the company is*

AMENDED COMPLAINT - 57

*updating guidance to reflect a reduction in projected capital spending for the 2001-2002 period, from $3.2 billion to $2.0 billion.* The reduced capital requirements reflect: 1) the redeployment of warehouse equipment, 2) availability of better-than-expected equipment pricing, and 3) greater capacity realization from deployed technology. . . In addition to the foregoing, at this time *Williams Communications Group also reduced projected Network revenues for 2001 by at least $90 million, to $1.1-$1.2 billion, down from pre-spinoff estimates of as much as $1.4 billion.* Since June 2000, the time when the spin-off was first announced, Williams Communications Group had lowered 2001 sales forecasts four times. The reduction of capital expenses and the reduction of Williams Communications Group's revenue forecasts acted as a partial admission that Defendants lacked any reasonable basis to state, previously, that Williams Communications Group was on track to meet financial forecasts for 2001. By radically reducing capital expenditures in 2001, as Defendants knew they would be forced to do as a result of the impaired operational capacity of Williams Communications Group following the spinoff, Defendants also knew that it would be impossible to obtain targeted revenue and earnings forecasts for the year. In fact, it was only as a result of Defendants' massive cap-ex reductions that the company could claim that it was fully funded going forward. However, *this statement failed to reveal that Defendants had now sacrificed the company's earnings potential merely to stay in business.*

106. On August 2, 2001 Williams Companies announced that it had completed the acquisition of Barrett pursuant to the terms previously announced and pursuant to the Agreement and Plan of Merger dated 5/7/01.

107. On August 29, 2001, the *Associated Press* news wire service reported that shares of Williams Communications Group again plunged after analysts stated that Williams Communications Group was facing debt problems and would not be able to meet certain imminent debt covenants. Immediately following this decline, *AP* reported the reaction of Steven Remchuk, regional investment executive in Tulsa for Banc One Investment Advisors, who stated, "*The market is telling*

AMENDED COMPLAINT - 58

*you there is a high probability that they are going to have difficulty surviving in their current form.*" *AP* also quoted after Peter Cohan, a Massachusetts financial analyst and author, who stated *"I think Williams could be another of those companies who won't make it."* Based on the price of shares and possibility that the company won't be able to meet a Sept. 30 financial obligation, Cohan said Williams Communications Group finds itself in a "bad financial situation."

> On August 30, 2001, according to *Tulsa World*, Williams Communications Group denied reports that it would default on any of its covenants related to its September 30, 2001 deadline to raise $700 million from the sale of Solutions and that it would be able to issue $150 million in equity by year end.

108.     On September 17, 2001, Williams Communications Group issued a release published on *PR Newswire* which announced that the company had completed the lease-back of One Technology Center, Williams Communications Group's recently acquired Tulsa headquarters, to Williams Companies in exchange for $276 million in cash. This news, however, further depressed Williams Communications Group shares, which closed the day's trading at $1.41 per share, down $0.07 per share. Based on this share price, the 24.3 million shares of stock traded to Williams Companies in exchange for One Technology Center and the company's $950 million promissory note was now worth $36 million. At no time did Williams Companies even attempt to explain the business judgment which propelled Williams Companies to enter into this transaction.

109.     The materially false and misleading statements issued by Williams Companies had their intended effect. As evidence of this, on September 26, 2001, Credit Lyonnais analyst Gordon Howald issued a report on Williams Companies, reiterating an "ADD" recommendation and a $34 price target, as follows:

> * Based on a worst-case scenario in which Williams Communications Group (WCG) files for bankruptcy protection, which we believe is unlikely, Williams has a maximum liability exposure of $2.4 billion, including secured and non-secured debts.

AMENDED COMPLAINT - 59

* Relative to earnings, we estimate a WCG bankruptcy protection filing would have a negative impact of $0.12 per share on 2002 earnings due to share dilution.

* * *

WCG Bankruptcy Scenario-Unlikely

As the telecommunications sector continues to deteriorate, there has been concern over Williams's exposure to WCG. WCG was spun off from Williams on a tax-free basis on April 23, 2001. While WCG and Williams operate as separate companies, Williams has approximately $2.4 billion of maximum potential liability in the event of a WCG bankruptcy. This worst-case scenario assumes that WCG's assets become totally worthless, and that the value of its debt declines to zero. However, we believe a bankruptcy filing by WCG is unlikely for several reasons.

(1) WCG is funded through 2003. Williams reported cash on hand at the end of 1Q01 of about $238 million and raised $1.4 billion from the issuance of a structured note, increased its credit facility by $450 million and completed certain asset sales for $264 million. The company also expects to raise incremental funds through additional asset sales and other activities that could approach $900 million or more – this includes the recently closed sale/leaseback of WCG's corporate headquarters in Tulsa, Oklahoma to Williams Companies. The combined proceeds from all of these transactions, including cash from operations, is expected to fund WCG through 2003, at which point the company is expected to turn cash flow positive...

(2) WCG has stated publicly that it has no intention of filing for bankruptcy protection and has no reason to file. It has taken a very strong stance. We believe that if WCG suddenly changes its stance, its damage to shareholder credibility would exclude it from having any meaningful, future relationship with the investor community.

AMENDED COMPLAINT - 60

It is obvious from the foregoing that the analysts at Credit Suisse had fully relied on Defendants' misleading statements to reach its conclusion that Williams Communications Group was well funded, given the fact that it relied on the same false premise that Williams Communications Group was funded through 2003, without taking into account the effects of the company's massive cap-ex reductions and revenue forecast revisions and given the fact that the analysts based its opinion on the basis of Williams Communications Group's denials that it would need credit support.

110.   On September 28, 2001, investors began to run scared as Williams Communications Group failed to issue any statement regarding its ability to raise the full $700 million pursuant to its loan covenants, the last $200 million of which was purportedly to come from accounts receivable collections. *On September 28, 2001, shares of Williams Communications Group closed at $1.18 per share*, near the bottom of the stock's 52-week range of $1.12 to $21.13. Despite the fact that Williams Communications Group had apparently scraped the remainder of the money together at the last minute, with no explanation as to where the remainder of the money Williams Communications Group needed to meet its obligations came from, on October 1, 2001, Williams Communications Group simply issued a release published on *PR Newswire* which stated that it had met all covenant requirements under its bank credit facility and publicly traded bonds for 3Q:01.

111.   Investors, however, were not impressed by Williams Communications Group's purported last-minute satisfaction of its debt covenants, and shares of Williams Communications Group stock traded down to close at $1.14 per share on October 1, 2001.

112.   On October 25, 2001, *Bloomberg* reported that Williams Companies had announced that its 3Q:01 profits had surged 83%, in significant part due to its acquisition of Barrett, as follows:

**Barrett Pays Off**

Williams' earnings from trading were $357.2 million while profit from producing gas more than tripled to $56.9 million. . .

*With Barrett, Williams has hedged about 80 percent of production for the next three years at more than $4 per million British thermal units. . . This is well above the current price on the New York Mercantile Exchange of about $2.90.*

"The Barrett acquisition just really improved their earnings," said Edward Jones analyst Zach Wagner, who doesn't own Williams shares.

* * *

Williams boosted its forecast for full-year earnings to $2.40 a share, from $2.30 and $2.35. The company expects earnings to rise 15 percent a year.

Third-quarter profit was reduced $105.5 million by writedowns and other unspecified costs, Williams said. The company had a $71 million writedown for a drop in value of its 4% stake in Williams Communications Group, Inc., whose shares have plunged 93% in the past year.

Excluding the items, Williams said it earned $326.8 million, or 65 cents per share.

The company was expected to make 53 cents a share on that basis, the average estimate of analysts surveyed by Thompson Financial/First Call. Forecasts ranged from 48 cents to 66 cents.

Included in the writedown was $70 million attributed to the diminution in value of Williams Companies' investment in Williams Communications Group, of which Williams Companies still maintained approximately 20 million shares. Based on this devaluation, had Williams Companies not foisted Williams Communications Group onto its shareholders in 4/01, Williams Companies would now be faced with a massive writedown in excess of over 2.23 billion in addition to the credit guarantees which it would likely still have been required to provide.

113.    On November 1, 2001, *Bloomberg* reported that Williams Communications Group had announced that it had meet analysts' 3Q:01 loss projections despite larger than expected

expenses related to depreciation and amortization expenses, which nearly tripled compared to 3Q:00. These results did little to restore investor confidence in Williams Communications Group and its shares traded down $0.11 to close at $1.56 per share.  The continuing depressed price of Williams Communications Group shares made it impossible for the company to sell the required $125 million in equity by December 31, 2001, without substantially diluting the company's existing shareholders and without further jeopardizing the company's ability to retain its share listing on a national exchange.  Thus, on November 1, 2001, Williams Communications Group also announced that it had altered its bank credit facility covenant which required the company to raise additional capital by the end of 2001.  With the change, the company said the date by which it has to raise additional funds has been extended to July 1, 2003.

114.    Then, on January 29, 2002, Williams Companies shocked the market by announcing that it would be delaying the release of its 2001 earnings "pending an internal assessment of William's contingent obligations to Williams Communications."  According to the press release, Williams Companies "expects to be able to estimate the financial effect, if any, regarding its ultimate obligation related to Williams Communications Group's $1.4 billion debt and network lease agreement covering assets that cost $750 million."

115.    In response to Williams Companies' shocking announcement, the price of Williams Companies common stock declined sharply falling from approximately $24 per share to as low as $18.70 per share and Williams Communications Group common stock declined to as low as $1.30 per share.

116.    Williams Companies failed to disclose the following:

(a)    that Williams Companies was carrying on its financial statements receivables from Williams Communications Group that were impaired, uncollectible, and should have been written-off in whole or in substantial part.  Rather than writing off these impaired assets, which amounted to tens of millions of dollars, Williams Companies agreed to extend up to $100 million of

AMENDED COMPLAINT - 63

Williams Communications Group's receivables with an outstanding balance due on March 31, 2001, to March 15, 2002; and

(b)    that the sale and leaseback of Williams Communications Group's office properties in or about September 2001 was a non-arm's-length transaction at an inflated value for the properties whose motive and intent was to funnel monies to Williams Communications Group and avoid forcing Williams Companies to perform its guarantees and thereby adversely affect its results and debt ratings.

117.    By causing, allowing or failing to correct these omissions, Defendants breached their fiduciary duty to disclose complete and accurate information regarding Williams Companies stock, one of the Plan investment options.    Additionally, Defendants breached their duty to monitor Williams Company stock and Williams Communications Group stock and ensure that they were prudent investments for the Plan.

118.    On June 10, 2002, Williams Companies announced in a press release that it was sharply reducing its 2002 forecast, predicting that annual recurring earnings, adjusted for one-time charges, would be $1.32 to $1.70 a share; earlier the company had forecast $2.15 to $2.30 a share.

119.    On July 22, 2002, Williams Companies announced in a press release that it expected a second quarter loss instead of an expected profit and cut its stock dividend by 95 percent.    The announcement sent shares tumbling below $1, plunging by 61%.

120.    In a press release dated July 29, 2002, Williams Companies reported a hefty second quarter loss, stating that it lost $349.1 million, or 68 cents per share, compared with earnings of $339.5 million, or 69 cents per share, in the year-earlier quarter.

## BREACHES OF FIDUCIARY DUTY

### Count One – Duty To Disclose And Inform

121.    Plaintiffs reallege and incorporate by reference herein the foregoing paragraphs 1- 120.

AMENDED COMPLAINT - 64

122.    ERISA § 404(a)(1)(A) (29 U.S.C. § 1104(a)(1)(A)) imposes on a plan fiduciary a duty of loyalty -- that is, a duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and its beneficiaries . . . ."  Section 404(a)(1)(B) (29 U.S.C. § 1104(a)(1)(B)) also imposes on a plan fiduciary a duty of prudence -- that is, a duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . ."

123.    A plan fiduciary's duties of loyalty and prudence include a duty to disclose and inform.  This duty entails:  (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries. This duty to disclose and inform recognizes the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the participants and beneficiaries, on the other.  In a plan with various funds available for investment, this duty to inform and disclose also includes:  (1) the duty to impart to plan participants material information of which the fiduciary has or should have knowledge that is sufficient to apprise the average plan participant of the risks associated with investing in any particular fund; and (2) the duty not to make material misrepresentations.

124.    By no later than the commencement of the Class Period, Defendants breached their fiduciary duties to disclose and inform with respect to the Plan's use of employer stock as a Plan investment.  During the Class Period, and before, any investment in employer stock in the Plan was an undiversified investment in a single company's stock.  As a result, any such investment carried with it an inherently high degree of risk.  These inherent risks made Defendants' duty to provide

complete and accurate information about investing in Company stock even more important than would otherwise be the case. Rather than providing complete and accurate information to the Plan's participants and beneficiaries regarding the risks of investing in company stock in the Plan, Defendants did the opposite: They withheld and concealed material information during the Class Period and before, and instead actively misled the participants and beneficiaries of the Plan about the appropriateness of investing in Company stock and about Defendants' earnings prospects and business condition, thereby encouraging participants of the Plan to continue to make and to maintain substantial investments in company stock in the Plan.

125.    In addition, Defendants breached their fiduciary duties to disclose and inform with respect to the Plan's use of WCG stock as a Plan investment. Rather than providing complete and accurate information to the Plan's participants and beneficiaries regarding the risks of investing in WCG stock in the Plan, Defendants did the opposite: They withheld and concealed material information during the Class Period and before, and instead actively misled the participants and beneficiaries of the Plan about the appropriateness of investing in WCG stock and about WCG's earnings prospects and business condition, thereby encouraging participants of the Plan to continue to make and maintain substantial investments in WCG stock in the Plan.

### Count Two—Duty to Eliminate Inappropriate Investment Options

126.    Plaintiffs reallege and incorporate by reference herein the foregoing paragraphs 1- 125.

127.    Under the terms of the Plan, the Defendant Members of the Benefits Committee had the authority to add and eliminate investment alternatives under the Plan with the advice and assistance of the Defendant members of the Investment Committee.

128.    Defendant members of the Benefit Committee and the Investment Committee either knew or were in a position to discover the facts relevant to the suitability and fair pricing of Company stock and Williams Communications Group stock at all relevant times.

129.    A fiduciary's duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of all the investment alternatives in the Plan, including employer securities, to ensure that each investment is a suitable option for the Plan. Defendant members of the Benefit Committee and Defendant members of the Investment Committee breached this duty of investigation and monitoring with respect to Company stock, and Williams Communications Group stock. By no later than the beginning of the Class Period, these Defendants could not have reasonably made a determination that Company stock was a suitable investment for the Plan, either for a participant's discretionary account or for the match. In fact, by the beginning of the Class Period, if not before, Company stock was plainly an unsuitable investment option for the Plan because it was unduly risky and trading at a fraud inflated price. Likewise, from the time that WCG stock was first offered by the Plan, these Defendants could not have reasonably made a determination that Company stock was a suitable investment for the Plan. It was plainly unsuitable because WCG was financially unsound and its stock was offered to Plan participants at a fraud inflated price.

130.    A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents. While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary, including a plan sponsor-fiduciary, may not blindly follow the plan document if to do so leads to an imprudent result. ERISA § 404(a)(1)(d) (29 U.S.C. § 1104(a)(1)(D)).

131.    To the extent that Defendants followed the direction of the Plan documents, for example, in continuing to place the match in Company stock during the Class Period, beginning no later than the matches of March 1, 1999, they further breached their fiduciary duties.

### Count Three—Failure to Monitor Benefits Committee – (against Defendant Williams Companies and Defendants Members of the Board of Directors)

132.    Plaintiffs reallege and incorporate by reference herein the foregoing paragraphs 1-131.

133.    As the Fiduciary with the authority to appoint and remove members of the Benefits Committee, the Defendant Williams Companies acting through its Board of Directors and the Defendants Members of the Board of Directors had a duty to monitor the conduct of the Benefits Committee to assure that they were performing their duties consistently with the requirements of ERISA.

134.    Because these Defendants knew or should have known of the failures of the Benefit Committee to fulfill its fiduciary responsibility and to assure in turn that the defendant members of the Investment Committee fulfilled their fiduciary responsibility, these Defendants breached their fiduciary responsibility by failing to replace the members of the Benefits Committee with persons who would act to protect the participants and beneficiaries of the Plan from inappropriate investments in Williams Companies stock and WCG stock.

### Count Four – Duty to Avoid Conflict of Interest

135.    Plaintiffs reallege and incorporate by reference herein the foregoing paragraphs 1-134.

136.    The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

137.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them when they occur by continuing to allow company stock and offering Williams Communications Group stock as a Plan investment during the Class Period, by failing to engage independent fiduciaries and/or advisors who could make independent judgments concerning the Plan's investment in company stock and the information provided to participants and beneficiaries concerning it, and, generally, by failing to take whatever steps were necessary to ensure that the fiduciary of the Plan did not suffer from a conflict of interest, including the notification of the

AMENDED COMPLAINT - 68

Department of Labor of the questionable transactions which made employer stock an unsuitable investment for the Plan.

## Count Five—Co-Fiduciary Duty under Section 405

138.    Plaintiffs reallege and incorporate by reference herein the foregoing paragraphs 1-137.

139.    Section 405 (a) of ERISA, 29 U.S.C. 1105 provides as follows:

(a)    **Circumstances Giving to Liability** – In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2)    if by his failure to comply with § 404(a)(1) in the administration of his specific responsibilities which gives rise to his status as a fiduciary to commit a breach; or

(3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

140.    By the conduct set forth above each of the Defendants has knowingly participated in the breaches of their co-fiduciaries, failed to fulfill their own fiduciary responsibilities as set forth in section 404 of ERISA so as to enable the breaches of their co-fiduciaries, and failed to take reasonable steps to correct the breaches of their co-fiduciaries of which they had knowledge.

### Count Six – Knowing Participation in a breach of Fiduciary Duty

141.    Plaintiffs reallege and incorporate by reference herein the foregoing paragraphs 1-140.

142.    To the extent that any of the Defendants named herein are found not to have been fiduciaries or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, each such defendant has knowingly participated in the breaches of those Defendants who were fiduciaries and acted in a fiduciary capacity and as such is liable for equitable relief as a result of participating in such a breach.

### CAUSATION

143.    The Plans suffered a loss, and Plaintiffs and the other Class members were damaged, because substantial assets in the Plans were invested in company stock and Williams Communications Group stock during the Class Period in violation of Defendants' fiduciary duties.

144.    As fiduciaries, Defendants were responsible for the prudence of investments in the Plan during the Class Period unless participants in the Plan themselves exercised effective and informed control over the assets in the Plan in its individual accounts pursuant to ERISA § 404(c) and the regulations promulgated under it. Those provisions were not complied with here; instead of taking the necessary steps to ensure effective participant control by complete and accurate disclosure and regulatory compliance, Defendants did exactly the opposite. As a consequence, participants in the Plans did not control the Plans assets that were invested in company stock, and Defendants remained entirely responsible for ensuring that such investments were and remained prudent. Defendants' liability to the Plans for damages stemming from imprudent Plan investments in Company stock and WCG stock is therefore established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plans during the Class Period, without regard to whether or not the participants relied upon Defendants' statements, acts, or omissions.

AMENDED COMPLAINT - 70

145.    The Plans also suffered a loss, and Plaintiffs and the other Class members were damaged, by Defendants' above-described conduct during the Class Period and before, because Defendants' caused, allowed and/or failed to correct materially deceptive statements, acts, and omissions which were fundamentally designed to deceive Plaintiffs and the other Class members about the prudence of making and maintaining investments in company stock. Where a breach of fiduciary duty consists of, or includes, causing, allowing or failing to correct misrepresentations and omissions material to a decision by a reasonable participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment. Here, Defendants' above-described conduct caused, allowed or failed to correct misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in company stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of its Plan assets in company stock or Williams Communications Group stock during the Class Period. In this case the uncorrected misrepresentations caused the price of Williams and Williams Communications Group stock to be inflated during the Class Period and allowed Williams Companies to satisfy its obligations to contribute company stock to the Plan with shares valued by the market at a price inflated by fraud. Had Defendants fulfilled their fiduciary duty not to cause, allow, or fail to correct the misrepresentations detailed herein, Williams Companies stock contributed to the Plan during the Class Period would have been fairly valued and a greater number of shares would have been contributed in by Williams Companies to meet its obligations to the Plan. Plaintiffs and the other Class members are therefore presumed to have relied to their detriment on Defendants' deceptive statements, acts, and omissions.

146.    Plaintiffs further contend that the Plans suffered losses, and Plaintiffs and the other Class members were damaged, by Defendants' above-described conduct during the Class Period and before, because that conduct fundamentally deceived Plaintiffs and the other Class members about

the prudence of making and maintaining investments in Company stock and Williams Communications stock, and that, in making and maintaining investments in company stock and Williams Communications Group stock, Plaintiffs and the other Class members relied to their detriment upon materially deceptive statements, acts, and omissions for which Defendants were legally responsible as well as the market effects of those statement acts and omissions.

### REMEDY FOR BREACHES OF FIDUCIARY DUTY

147.    ERISA § 502(a)(2) (29 U.S.C. § 1132(a)(2)) authorizes a plan participant to bring a civil action for appropriate relief under section 409 (29 U.S.C. § 1109). Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

148.    With respect to the calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the plan's assets to what they would have been if the plan had been properly administered.

149.    Plaintiffs and the Class are therefore entitled to relief from Defendants in the form of: (1) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as required by ERISA § 409(a) (29 U.S.C. § 1109(a)); (2) by removing the Benefits Committee and replacing it with independent fiduciaries pursuant to ERISA § 409(a) (29 U.S.C. § 1109); (3) injunctive and other appropriate equitable relief to remedy the breaches

AMENDED COMPLAINT - 72

alleged above, as provided by ERISA §§ 409(a) and 502(a)(2)&(3) (29 U.S.C. §§ 1109(a) and 1132(a)(2)&(3)); (4) reasonable attorney fees and expenses as provided by ERISA § 502(g) (29 U.S.C. § 1132(g)), the common fund doctrine, and other applicable law; (5) taxable costs; and (6) interest on some or all of these amounts as provided by law.

## PRAYER

In view of all of this, Plaintiffs and the Class pray for judgment against Defendants for a monetary payment to the Plans, injunctive and other appropriate equitable relief, reasonable attorney fees and expenses, taxable costs, interest, and any other relief the Court deems just.

DATED this 16th day of August, 2002.

Joel L. Wohlgemuth (Oklahoma Bar No. 9811)
NORMAN, WOHLGEMUTH CHANDLER &
DOWDELL
2900 Mid-Continent Tower
Tulsa, Oklahoma 74103
918-583-7571 (voice)/918-584-7846 (fax)

Lynn Lincoln Sarko
Britt L. Tinglum
Erin M. Riley
KELLER ROHRBACK, L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
206-623-1900 (voice)/206-623-3384 (fax)

Gary Gotto
Laurie Ashton
DALTON GOTTO SAMSON & KILGARD
3101 North Central Avenue, Suite 900
Phoenix, AZ 85012-2600
602-248-0088 (voice)/602-248-2822 (fax)

Marc I. Machiz
COHEN, MILSTEIN, HAUSFELD & TOLL
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005
202-408-4600 (voice)/202-408-4699 (fax)

Matthew J. Ide
COHEN, MILSTEIN, HAUSFELD & TOLL
999 Third Avenue, Suite 3600
Seattle, WA 98104
206 521-0080 (voice)/206-521-0166 (fax)

AMENDED COMPLAINT - 74

## CERTIFICATE OF SERVICE

I hereby certify that on the __16__ day of August, 2002, a true and correct copy of the above

and foregoing instrument was hand-delivered to:

Graydon Dean Luthey, Jr.
HALL, ESTILL, HARDWICK, GABLE, GOLDEN & NELSON
320 South Boston, Suite 400
Tulsa, OK 74103-3708

Howard Shapiro
Rene Elizabeth Thorne
Robert Wilkinson Rachal
SHOOK, HARDY & BACON, LLP
Amoco Building, Suite 1200
1340 Poydras Street
New Orleans, LA 70112

Joel L. Wohlgemuth

C:\My Documents\Amended.Complaint.Final.doc

AMENDED COMPLAINT - 75